2010-02014
FILED
January 11, 2010
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0002339953

57 Pages

1  Gregory C. Nuti, (SBN 151754)
2  E-Mail: gnuti@schnader.com
   Kevin W. Coleman (SBN 168538)
3  E-Mail: kcoleman@schnader.com
   SCHNADER HARRISON SEGAL & LEWIS LLP
4  One Montgomery Street, Suite 2200
   San Francisco, California 94104-5501
5  Telephone: 415-364-6700
   Facsimile: 415-364-6785
6
   John K. Gisleson (Pro Hac Vice)
7  E-Mail: jgisleson@schnader.com
   Keith E. Whitson (Pro Hac Vice)
8  E-Mail: kwhitson@schnader.com
   SCHNADER HARRISON SEGAL & LEWIS LLP
9  Fifth Avenue Place
   120 Fifth Avenue, Suite 2700
10 Pittsburgh, Pennsylvania 15222-3001
   Telephone: 412-577-5200
11 Facsimile: 412-765-3858
   Attorneys for Plaintiff Bradley D. Sharp,
12 Chapter 11 Trustee

13              UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF CALIFORNIA
14                   SACRAMENTO DIVISION

15 In re                                    Case No.: 09-29162

16 SK Foods, LP, a California limited partnership,   Chapter 11

17        Debtor.                           A.P. No.

18

19 Bradley D. Sharp, Chapter 11 Trustee of SK    **ADVERSARY COMPLAINT FOR**
   Foods, L.P., a California limited partnership,  **(1) AVOIDANCE OF PREFERENTIAL**
20                                                 **PAYMENTS PURSUANT TO 11**
          Plaintiff,                               **U.S.C. § 547**
21 vs.                                             **(2) AVOIDANCE OF FRAUDULENT**
                                                   **TRANSFERS PURSUANT TO 11**
22 Scott Salyer as trustee of the Scott Salyer     **U.S.C. § 548**
   Revocable Trust, SK PM Corp., SK Foods, LLC,    **(3) AVOIDANCE OF FRAUDULENT**
23 SKF Canning, LLC, Scott Salyer Revocable        **TRANSFERS PURSUANT TO 11**
   Trust, Blackstone Ranch Corporation, Monterey   **U.S.C. §§ 544(B) AND 550(A) AND**
24 Peninsula Farms, LLC, Salyer Management          **CALIFORNIA CIVIL CODE §§**
   Company, LLC, SK Farms Services, LLC, SK         **3439,07, 3439.04 AND 3439.05**
25 Frozen Foods, LLC, SS Farms LLC, SSC            **(4) SUBSTANTIVE CONSOLIDATION**
   Farming, LLC, SSC Farms I, LLC, SSC Farms       **(5) DECLARATORY RELIEF**
26 II, LLC, SSC Farms III, LLC ,                   **(6) RECOVERY OF FRAUDULENT**
                                                   **TRANSFERS; AND**
27        Defendants.                              **(7) TURNOVER OF PROPERTY OF**
                                                   **THE ESTATE**
28

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

1    Bradley D. Sharp, the duly appointed and acting Chapter 11 Trustee (the "Trustee") in the

2  cases of SK Foods, L.P., a California limited partnership ("SK Foods" or "Debtor"), hereby files

3  this Adversary Complaint, and in support thereof, avers as follows:

4                                   **INTRODUCTION**

5        This adversary proceeding seeks to substantively consolidate and otherwise recover for

6  the benefit of the Debtor's estate assets transferred to or otherwise in the possession of the

7  Defendants.[1]  The Debtor created, funded and operated many of the Defendants to such an extent

8  that their financial affairs and identities are entangled with those of the Debtor.  The Defendants

9  have little if any operations outside of their relationships with the Debtor, never dealt with the

10  Debtor at arms-length, relied on the Debtor to create, store and maintain their records and to

11  provide management and administrative services, never observed corporate formalities separate

12  and apart from the Debtor, and generally existed solely to benefit the operations of the Debtor

13  and to shelter assets from creditors of the various Defendants.  Funds were transferred between

14  Debtor and Defendants whenever one entity needed funds or whenever it suited the tax planning

15  purposes of Scott Salyer, the ultimate owner of all Defendants.  A review of SK Foods' general

16  ledger alone reveals net transactions to the named defendants and certain other related parties of

17  over $200 million.  *See* Exhibit A, attached hereto.  At present, it is not reasonably possible to

18  reverse all these transactions and ascertain which entity owns which assets without depleting all

19  available assets.  There is such an identity of assets and interests that Debtor is rightfully deemed

20  the owner of all assets of the Defendants, and the Defendants should be substantively

21  consolidated with the Debtor's estate so that creditors of all these various entities may be treated

22  equitably.  Alternatively, the many transfers from Debtor to Defendants should be avoided and

23  those assets returned to the Debtor.

24

25

26
_____

27    [1] In a separate proceeding, Debtor will seek to substantively consolidate with the
Debtor's Estate the Estate of RHM Industrial Specialty Foods, Inc., a California corporation
doing business as Colusa County Canning Co. ("RHM").

28

PHDATA 3265645_3

Adversary Complaint

## THE PARTIES

1.      Plaintiff Bradley D. Sharp is the duly appointed and acting Chapter 11 Trustee in the cases of SK Foods, L.P., a California limited partnership ("SK Foods" or " Debtor").

2.      SK Foods is a California limited partnership with a principal office at 1175 19th Avenue, Lemoore, California. Its registered agent is Scott Salyer.

3.      Scott Salyer ("Salyer") is an individual residing in the State of California. The Trustee is informed and believes and thereon alleges that Scott Salyer is trustee of Scott Salyer Revocable Trust.

4.      The Trustee is informed and believes and thereon alleges that the Scott Salyer Revocable Trust ("SSR Trust") is a California trust whose beneficiary is Salyer.

5.      The Trustee is informed and believes and thereon alleges that SK PM Corporation ("SKPM") is a California corporation with is principal place of business located at 21 Lower Ragsdale Drive, Monterey, California. Its registered agent is Mark McCormick.

6.      The Trustee is informed and believes and thereon alleges that SKF Canning, LLC ("SKF Canning") is a Nevada limited liability company.

7.      The Trustee is informed and believes and thereon alleges that SK Foods, LLC is a Nevada limited liability company.

8.      Defendants identified in paragraphs 3 through 7 are collectively referred to herein as the "Owner Defendants."

9.      Blackstone Ranch Corporation ('Blackstone") is a California corporation with a principal place of business at 1175 S. 19th Avenue, Lemoore, California. Its registered agent is Mark McCormick.

10.      SS Farms LLC ("SS Farms") is a California limited liability company with a principal address of 1175 19th Avenue, Lemoore, California. Its registered agent is Scott Salyer.

11.      SSC Farming, LLC ("SSC Farming") is a California limited liability company with a principal address of 1175 S. 19th Avenue, Lemoore, California.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

12.     SSC Farms I, LLC ("SSC I") is a California limited liability company with a principal address of 200 Sky Park Drive, Monterey, California. Its registered agent is Scott Salyer.

13.     SSC Farms II, LLC ("SSC II") is a California limited liability company with a principal address of 200 Sky Park Drive, Monterey, California. Its registered agent is Scott Salyer.

14.     SSC Farms III, LLC ("SSC III") is a California limited liability company with a principal address of 200 Sky Park Drive, Monterey, California. Its registered agent is Scott Salyer.

15.     The Trustee is informed and believes and thereon alleges that Monterey Peninsula Farms, LLC ("Monterey") is a California limited liability company.

16.     Salyer Management Company, LLC ("SMC") is a California limited liability company with a principal place of business at 200 Sky Park Drive, Monterey, California. Its registered agent is Scott Salyer.

17.     SK Farms Services, LLC ("SK Farms Services") is a California limited liability company with a principal place of business at 200 Sky Park Drive, Monterey, California. Its registered agent is Mark McCormick.

18.     SK Frozen Foods, LLC ("SK Frozen Foods") is a California limited liability company with is principal place of business located at 200 Sky Park Drive, Monterey, California. Its registered agent is Mark McCormick.

19.     Defendants identified in paragraphs 9 through 18 are collectively referred to herein as the "Affiliated Defendants".

## JURISDICTION AND VENUE

20.     On or about May 7, 2009, the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et. seq.* (the "Bankruptcy Code."). An involuntary petition was filed with respect to the Debtor on or about May 5, 2009 ("Petition Date").

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

21.     This Court has jurisdiction over this adversary proceeding under 28 U.S.C.
§§ 1334 and 157, and Rule 7001(7) and (9) of the Federal Rules of Bankruptcy Procedure.

22.     This is a core proceeding under 28 U.S.C. §§ 1408 and 1409.

23.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

BACKGROUND[2]

## Common ownership, management and control

24.     SK Foods is owned 45.55% directly by the SSR Trust.  The other 54.45% is
owned by SKPM, which in turn is owned 100% by the SSR Trust.

25.     RHM is owned 60% by SKF Canning, which in turn is owned 100% by the SSR
Trust.  Two trusts set up for Mr. Salyer's daughters (the Stephanie Ann Salyer 2007 Trust ("SAS
2007 Trust") and the Caroline Gazelle Salyer 2007 Trust ("CGS 2007 Trust")) own 20% each of
RHM as well.

26.     Mr. Salyer and his daughters, or trusts for which they are beneficiaries, own,
directly or indirectly in various combinations, 100% of each of the Owner Defendants and the
Affiliated Defendants.

27.     Blackstone, SKF Canning and SKPM are owned 100% by the SSR Trust.

28.     SK Foods, LLC is owned 45.55% directly by the SSR Trust, and 54.45% by
SKPM, which in turn is owned 100% by the SSR Trust.

29.     SS Farms and SSC Farming are each owned 60% by the SSR Trust, with the
Stephanie Ann Salyer Trust ("SAS Trust") and the Caroline Gazelle Salyer Trust ("CGS Trust")
each owning 20% as well.

30.     SSC I and SSC II are owned 50% by the SSR Trust and 50% by the SAS Trust.

---

[2] The allegations set forth herein are based on the Trustee's investigation and review of
SK Foods' documents in compliance with all court orders currently in effect.  The Trustee
reserves the right to amend or supplement these allegations as appropriate as additional
information becomes available.

PHDATA 3265645_3

Adversary Complaint

31.    SSC III is owned 33.34% by the SSR Trust and 33.33% each by Stefanie Salyer and Caroline Salyer.  Monterey is owned 61.52% by SSC Farming, 10.49% by SS Farms and 13.99% by SSC I, and 13.99% by SSC II.

32.    SK Frozen Foods and SMC are each owned 60% by the SSR Trust, and 20% each by the SAS 2007 Trust and the CGS 2007 Trust.

33.    SK Farms Services is owned 100% by SMC, which as set forth above, is owned by the SSR Trust, the SAS 2007 Trust and the CGS 2007 Trust.

34.    At all relevant periods Scott Salyer, by or through entities he owned and controlled, controlled, operated and managed the Debtor and each of the Owner Defendants and Affiliated Defendants.

35.    Salyer is the Trustee and beneficiary of the SSR Trust.

36.    Salyer was, at all relevant times, the President/Chief Executive of SKPM, the general partner of SK Foods.

37.    Salyer has represented himself at various points in time as Chief Executive Officer, Director and President of SK Foods.  He has also signed documents on behalf of SK Foods in his capacity as President of SKPM, its general partner.

38.    Salyer was at all relevant times Chief Executive Officer of RHM.

39.    Upon information and belief, Salyer was at all relevant times a principal officer of SKPM.

40.    Salyer controls the Owner Defendants through his direct or indirect ownership interests and his positions as an officer, manager, director or trustee of the Owner Defendants.

41.    Upon information and belief, Salyer is the Manager of, or has ultimate control over, SKF Canning, SK Foods, LLC, Blackstone, SS Farms, SSC Farming, SSC I, SSC II, SSC III, SK Frozen Foods, SMC, SK Farms Services and Monterey.

42.    Upon information and belief, Salyer controlled each of the Affiliated Defendants directly or indirectly by virtue of his ownership and/or management of the various trusts and companies named as Defendants.  He directly interacted with officers and managers and gave

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

instructions to them concerning operation and management of the Debtor and the Defendants,

and those officers and managers followed Salyer's instructions.

### Single Enterprise

43.    The Debtor and the Defendants at all relevant times formed a cohesive single

enterprise that together enabled the Debtor to grow, harvest, process, ready for shipment and ship

tomatoes, other crops and products.

44.    Although each Affiliated Defendant claims separate corporate or other separate

and distinct legal existence and nominally hold title to separate assets, in reality, each Affiliated

Defendant is part of the Debtor's business and operates as part of a coordinated single enterprise.

45.    SSC Farming, SSC I, SSC II and SSC III, and for a time Blackstone, held title to

certain land and grew tomatoes or other crops on that land.  SS Farms would provide farming

services, including harvesting, to these other entities.  SS Farms would then provide the crops to

SK Foods or RHM for processing.

46.    In the course of processing tomatoes and other crops, SK Foods and RHM would

discharge wastewater on land owned by SSC Farming, SSC I and SSC II.  SK Foods also utilized

wood bins nominally owned by the SSR Trust.

47.    SK Foods utilized assets and services of other entities owned and controlled by

Salyer for various transportation purposes, including but not limited to SKF Aviation, LLC and

CSSS, LP d/b/a Central Valley Shippers.

48.    SS Farms and Blackstone also held title to harvesters, vehicles and other

equipment which they made available for use by each other and SK Foods at the discretion of

employees of SK Foods.  Blackstone also served as a conduit through which funds of SK Foods

and/or the Affiliated Defendants flowed to other Defendants, as well as a source of funds for

Salyer personally.

49.    SMC was formed to receive "management fees" from SS Farms and other

entities, allegedly for services provided by SK Foods' employees.  In reality, SMC served as a

conduit through which funds of SK Foods and/or the Affiliated Defendants flowed to Salyer

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

1    and/or one of Salyer's ex-wives to satisfy Salyer's personal obligations under a divorce

2    settlement.

3        50.    Monterey was formed for the purposes of pooling available assets of other

4    Affiliated Defendants, including SSC Farming, SSC I and SSC II, as well as other entities in

5    which Salyer had an interest.  Upon information and belief, Salyer and the Owner Defendants

6    sought to pool assets within Monterey in order to obtain additional financing against the pooled

7    assets.  Upon information and belief, but for aggregating the assets in a separate entity, the

8    entities holding nominal title to the assets had insufficient equity or income with which to obtain

9    financing.

10       51.    SK Frozen Foods was formed in order to flash freeze vegetables.  The Owner

11   Defendants intended SK Frozen Foods to be operated and funded by another Salyer-owned entity

12   (Salyer American Fresh Foods) (which is currently in receivership).

13       52.    SK Farms Services was formed in December 2007 to centralize purchasing for

14   Debtor and the other Defendants.  This entity never had any independent operations or assets.

15       53.    SK Foods also owned international operations.  These operations took place

16   mainly in New Zealand, Australia and Japan, and the entities involved in these operations are

17   hereinafter referred to as the "Foreign Entities."

18       54.    From a financial perspective, the Defendants and the Foreign Entities were

19   entirely dependent upon continued financing from SK Foods to remain operating.

20       55.    Each year before the start of the new packing season, generally in or about May,

21   Salyer and his management team would hold a "pre-pack meeting."  At this meeting the

22   management of SK Foods met to discuss all or substantially all aspects of the season – planting,

23   growing, harvesting, processing, and selling.  The pre-pack meeting necessarily required the

24   attendance and participation of the Defendants and their management teams, to the extent there

25   was any distinction.  Attendees included individuals responsible for management of each of

26   those components, and the purpose of the meeting was to coordinate operations for the success of

27   the Debtor.  The attendees included (among others) Salyer and the individuals responsible for

28

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

1  agriculture operations and sales.  The attendees generally discussed (among other things) what

2  customers wanted, what would be grown and packed, what would be processed, and costs.

3      56.    A written pack plan typically was created and distributed to facilitate coordination

4  and thus the operation as a single enterprise.  The pack plan included spreadsheets that identified

5  the anticipated crop yield, processing cost estimates, quantity and quality of customer contracts

6  and demands, and market prices for finished product.

7      57.    During the season, the management teams and individuals responsible for

8  growing, harvesting, processing, and selling would coordinate their effort.  For example, the

9  executive who oversaw operation of SK Foods' and RHM's processing plants would coordinate

10  with the executive responsible for agricultural operations.  Both were employees of SK Foods,

11  but the executive responsible for agricultural operations also had responsibility for certain of the

12  defendants that owned and farmed the land used for produce processed by SK Foods and RHM.

13      58.    SK Foods' Vice President of Ag Operations (Rick Emmett) had the authority to,

14  and did, direct, control, deploy and utilize all assets necessary to effect the pack each season

15  regardless of the entity that nominally held title to the particular assets.

16      59.    Employees of SK Foods could access land and use equipment nominally owned

17  by any particular Affiliated Defendant at their discretion without seeking or needing permission.

18      60.    Salyer and others in management of SK Foods and the Affiliated Defendants held

19  themselves out to the public and their creditors as a single enterprise.  Salyer and others in

20  management of SK Foods and the Affiliated Defendants sometimes referred to SK Foods and the

21  Defendants as "SK Foods Group".  The Debtor's marketing brochures described SK Foods

22  Group as "one of the world's leading international growers and processors of vegetable

23  products," confirming that the Debtor and the Defendants operated as a single enterprise.

24      61.    Salyer and certain management employees working for Salyer also have referred

25  to the various Salyer-owned Defendants, including the Owner Defendants, the Affiliated

26  Defendants and others, as "Salyer Enterprises," confirming the common ownership and control

27  of the various entities.

28

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

62.　In 2007, in negotiations with its lenders, SK Foods proposed to include many of the Defendants as co-obligors under the loans and lines of credit it was seeking to obtain. These Defendants included Blackstone, SS Farms, SSC Farming, SKPM, SKF Canning and RHM, and other parties included were RHM, SKF Aviation, LLC and CSSS, LP.

63.　The number of related entities and the relationships between and among the Defendants has caused confusion as to on whose behalf certain acts have been taken.

64.　Salyer purposely blurred the legal distinctions among the Debtor, the Owner Defendants and Affiliated Defendants in order to advance his personal objectives. He failed to maintain any separation of legal representation between and among the Debtor, the Owner Defendants and Affiliated Defendants and allowed sophisticated legal counsel to access confidential information of one entity to be used for the benefit of other entities and himself personally.

### No independent operations

65.　Apart from supporting the Debtor's processing business, the Affiliated Defendants have little or no independent operations and could not exist as a going concern but for the financial and operational assistance provided by the Debtor.

66.　SSC I and SSC II had two sources of revenue. SK Foods paid to discharge wastewater onto land to which they hold title (but which as set forth below was provided to them by SK Foods for no consideration). They also grew crops which they sold exclusively to SK Foods. SSC I and SSC II have no further agricultural operations since the sale of the Debtor's operating assets—their entire business was limited to growing crops for SK Foods and receiving discharged wastewater from SK Foods.

67.　Other than a minor quantity, all of SSC Farming's crops were sold to SK Foods.

68.　Ninety percent or more of crops harvested by SS Farms were processed by SK Foods.

69.　SS Farms performed agricultural services almost entirely for Debtor and other Defendants, such as SSC Farming and Blackstone.

70.　RHM was a contract processor for SK Foods, and had no other operations.

10

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

71.     SKF Aviation, LLC obtained 100% of its operating revenue exclusively from SK Foods and related parties.  It had no revenue generated from any third-party source.  Strictly for accounting purposes, SKF Aviation's operating costs were intended to be allocated between SK Foods, RHM, SS Farms and Cedenco (one of the Foreign Entities), although SK Foods historically funded substantially all costs and expenses of ownership and operation.  Although SKF Aviation provided some aviation transportation to SK Foods employees for business related travel, the amount of such services were grossly in disproportion to the amount of funding provided by SK Foods. Substantially all of CSSS, LP's revenues are derived from services rendered to SK Foods.

72.     In fact, many of the Affiliated Defendants did not have any employees.  For instance, Blackstone and SSC Farming did not have any employees.  The few CSSS and SS Farms employees reported to SK Foods managers.

73.     Upon information and belief, all of the other Affiliated Defendants had limited, if any, operations or interactions outside the SK Foods family of companies.

**Affiliated Defendants were never capitalized or operated for profit**

74.     Many, if not all, of the Affiliated Defendants were never capitalized from funds outside the enterprise.  The Debtor directly and indirectly provided "intercompany" transfers, alleged "prepaid expenses" or putative loans in order to capitalize the Affiliated Defendants.

75.     For example, the members of SSC I and SSC II never provided any capital in exchange for their membership interests in these limited liability companies.  SSC I and SSC II's only assets are the land to which they hold title and the "financial arrangements", e.g. purported contracts, receivables and "prepaid expenses", with SK Foods and other Salyer-related entities.

76.     SSC I and SSC II have never operated at a profit, and upon information and belief, were never intended to operate at a profit.  In each year of their existence, their expenses were significantly more than their revenue.

77.     On information and belief, SK Foods directly or indirectly provided all capital to finance CSSS.  CSSS provided shipping services to SK Foods for transportation of SK Food's product.  CSSS's only asset was or is a leased railroad spur.  CSSS hired haulers as independent

11

PHDATA 3265645_3

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

contractors. On information and belief, Salyer's goal for CSSS was to generate only enough revenue to pay the premium on a life insurance policy under which he was covered so the cost would not come out of his own pocket. Since the sale of the Debtors' operating assets, CSSS has ceased all operations.

78. SK Foods provided all the funds to capitalize SK Frozen Foods. SK Frozen Foods' putative owners, SSR Trust, CGS 2007 Trust, and SAS 2007 Trust, did not provide any capital in exchange for their membership interests. SK Frozen Foods never had any officers or employees and is a mere shell entity. SK Foods provided SK Frozen Foods funds to lease premises ("Monterey Fish Company facility") in order to flash freeze broccoli, cauliflower, and peppers. Another Salyer entity that currently is in receivership (Salyer American Fresh Foods ("SAFF")) was to operate and fund SK Frozen Foods. Like SK Frozen Foods, SAFF lacked the funds to purchase equipment necessary to flash freeze produce and to retrofit the Monterey Fish Company facility to operate the business. As a result, SK Foods also provided the funds to purchase the flash freeze equipment and paid approximately $1 million to retrofit the facility.

79. Despite SK Foods investing approximately $2 million into the frozen vegetable business, the business was abandoned before operations began. Sometime in 2009, assets were transferred from SK Foods to SK Frozen Foods. SK Frozen Foods sold the assets in May or June 2009 to John Bryce, a former employee of SAFF. On information and belief, Salyer or another company controlled by him retained the proceeds, and did not repay SK Foods.

80. SK Foods provided $500,000 to SKF Aviation to help fund the $1.5 million acquisition cost of an aircraft. SK Foods also guaranteed the loan used to finance the purchase price of another aircraft.

81. SK Foods also guaranteed leases issued to SS Farms.

82. Scott Salyer created Monterey in late 2008 or early 2009 to receive assets of the SSC Entities (SSC Farming, SSC I, SSC II and SSC III) because of difficulties he had in obtaining financing for the SSC Entities and for Salyer American Fresh Foods ("SAFF"). As stand-alone entities these companies were not credit worthy without financial backing from SK Foods. SAFF was unprofitable eight out of the ten years it was in operation and presently is in

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

receivership. On information and belief, Salyer sought to pool the assets of SAFF and the SSC Entities in order to obtain additional financing. Through intercompany loans, Monterey could then provide needed financing to SAFF, which it could not otherwise obtain.

83. Upon information and belief, SKPM does not have any business operations. Any corporate officers have resigned.

84. SMC was formed to receive purported "management fees" from SS Farms and other entities for services provided by SK Foods' employees. In reality, the purpose of SMC was a conduit for money from operations of the single enterprise to pay one of Scott Salyer's ex-wives consistent with the terms of a divorce settlement. On information and belief, Salyer's obligation to his ex-wife is approximately $50,000 per month and an annual $1 million payment. SMC did not provide reasonably equivalent value for the monies it received; rather, any services were provided by employees of SK Foods.

85. Upon information and belief, the other Affiliated Defendants similarly were undercapitalized or not capitalized at all.

86. Upon information and belief, many of the Affiliated Defendants were not profitable and were never intended to operate in a fashion that would generate a profit.

**Failure to Adhere to Corporate Formalities**

87. Upon information and belief, the Owner Defendants and the Affiliated Defendants did not follow or adhere to corporate formalities.

88. One of the few "board of directors" meeting for any of the entities was held on December 14, 2007. The meeting minutes are entitled "SK Foods Entities" and states "The regular meeting of the SK Foods company including all SK Foods entities was called to order . . ."

89. At this December 14, 2007 meeting, Salyer and several other members of management discussed the possible "collapse" of Blackstone and the "collapse" of RHM. The managers in attendance also heard a presentation regarding the finances of "Central Valley Shippers d/b/a SARS," and approved the "collapse [of] that entity into SK Foods, L.P."

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

90.     At the December 14, 2007 meeting, the managers in attendance were presented with information for the new formations of SK Farms Services and SK Frozen Foods and others, and the managers in attendance approved the transfer of assets from SK Foods to SK Frozen Foods.

91.     Almost all of the business conducted at this meeting related to Affiliated Defendants, rather than to SK Foods.

92.     One of the few, and perhaps the only, partnership meeting of SK Foods took place on May 28, 2008. The minutes of that meeting declare a quorum based on the presence of Salyer alone. The purpose of the meeting was simply to "accept the resignation" of Randy Rahal as a Director.

93.     Upon information and belief, neither SK Foods nor any of the Owner Defendants or Affiliated Defendants had regular meetings of shareholders, directors, partners or members.

94.     Upon information and belief, when meetings were held by owners or management, those meetings were not limited to a single entity, but rather, involved overlapping issues involving many if not all of the Owner Defendants and Affiliated Defendants, as well as other Salyer-related entities.

**Shared management and administration**

95.     Debtor, the Owner Defendants and the Affiliated Defendants shared management.

96.     Management for the Affiliated Defendants were employees of SK Foods and paid by SK Foods, even though they performed services for other Defendants.

97.     Shondale Seymour served as Chief Financial Officer of SK Foods and of various Affiliated Defendants, including Blackstone, SS Farms and SSC Farming.

98.     Lisa Crist was Executive Vice President of Administration of the Debtors and various Affiliated Defendants.

99.     Steve King, SK Foods' former Vice President of Operations also provided senior management oversight for CSSS and for certain activities of SSC Farming, SSC I and SSC II.

14

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

100.     Richard Emmett, SK Foods' former Vice President of Ag Operations, also provided senior management oversight for SS Farms, SSC Farming, SSC I and SSC II.  His business card represented that he was employed by SK Foods.

101.     Upon information and belief, Jeanne Johnston was responsible for business development matters for the "SK Foods Group" in its entirety, including marketing materials and also served as Mr. Salyer's executive assistant for all matters relating to the Salyer's business interests.

102.     Richard Lawrence was Vice President of SK Foods' International Operations, and also served as Managing Director of certain of the Foreign Entities.

103.     Until his resignation effective December 11, 2006, Mark S. Grewal was an officer, manager or director of SK Foods as well as all of the following entities:  SKPM, SKF Aviation, SKF Canning, RHM, SK Foods, LLC, SS Farms, SSC Farming, Blackstone, CSSS, certain of the Foreign Entities and SSC Investments, among others.

104.     Until his resignation effective May 6, 2006, Richard Washburn was an officer manager or director of each of the following entities:  SKPM, SKF Aviation, SKF Canning, RHM, SK Foods, SK Foods, LLC, SS Farms, SSC Farming, Blackstone, CSSS, certain of the Foreign Entities and SSC Investments, among others

105.     SK Farms Services did not have any officers and relied entirely on SK Foods for its management.

106.     As of January 2009, with the exception of one administrative staff and a few farm hands, all other administrative and operations support for SS Farms, SSC Farming, SSC I, SSC II, SK Farms Services, and other Affiliated Defendants were provided for and paid for by SK Foods.  These functions included human resources, administration, IS/IT functions, and accounting.

107.     Individuals in SK Foods' accounting department performed accounting functions for many of the Affiliated Defendants, including but not limited to SS Farms, SSC Farming, SSC I and SSC II.

15

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

108.   SK Foods' Information Services department performed IT functions for the Affiliated Defendants.

109.   SK Foods provided management for certain of the Foreign Entities.  Although for some time management fees were charged to those Defendants, no effort was ever made to collect the fees.

110.   Upon information and belief, SK Foods employees performed management and administrative functions for the other Affiliated Defendants as well.

111.   Although SK Foods employees performed accounting and record keeping services for the Affiliated Defendants, neither SK Foods nor the Affiliated Defendants tracked the amount of time or the specific services being provided by SK Foods.

112.   In addition, although SK Foods and the Affiliated Defendants purported to allocate administrative expenses to the appropriate company or recipient, the Affiliated Defendants never paid the allocated expenses billed by SK Foods.  Nor did SK Foods ever seek to enforce or otherwise obtain payment.

113.   After 2007, SK Foods and the Affiliated Defendants stopped allocating administrative expenses because they were never paid in the past and because there was no meaningful way to allocate those expenses.

**Shared facilities, records and resources**

114.   SK Foods had several physical locations.  "SK Foods Group" maintained "Executive Offices" at 200 Sky Park Drive, Monterey, California.  SMC, SSC I, SSC II, SSC III, SK Farms Services, SK Frozen Foods and SKF Aviation all listed this address as their primary location.

115.   "SK Foods Group" maintained "corporate offices" at 21 Lower Ragsdale Drive, Monterey, California.  SKPM also listed this address as its principal location.

116.   The SK Foods maintained and operated its processing operations at 1175 S. 19th Avenue, P.O. Box 160, Lemoore, California.  RHM, SS Farms, SSC Farming, Blackstone and CSSS all listed this address as their primary location.

PHDATA 3265645_3

Adversary Complaint

117. Records of the various entities were stored and maintained together. Paper records of the various entities were stored at SK Foods' places of business or in storage units under SK Foods' control.

118. The Defendants' electronic documents were stored on computer systems owned and maintained by SK Foods.

119. All Defendants and others used the SK Foods email addresses and the SK Foods.com domain name. The Defendants used SK Foods' e-mail servers to store and maintain all their e-mail correspondence.

120. SK Foods employees had unfettered access to all of the Defendants' paper and electronic records.

121. SK Foods employees also regularly accessed these records for the benefit of, and at the specific request of, the Defendants.

122. Almost all of the Defendants shared insurance coverage with SK Foods for workers' compensation and general liability under policies purchased and paid for by SK Foods. For instance, an insurance policy issued to "SK Foods PM Corp" on February 19, 2009 identified the following entities under the definition of "Company": SKPM, SK Foods, L.P., Salyer, Blackstone, the SSR Trust, the CGS Trust, the SAS Trust, SS Farms, SARS, LLC, CSSS, SK Foods, LLC, SKF Aviation, SSC Farming, SSC I, SSC II, SSC III, SK Farm Services, SK Frozen Foods, RHM, Carmel Wine Merchants, and others.

123. In 2006, SK Foods prepared consolidated financial statements which included the financial position and results of operations of the Foreign Entities, as well as SKF Aviation and RHM.

124. Assets were purchased for Blackstone, SKF Aviation, the Foreign Entities and other Salyer entities, including Salyer personally, using SK Foods credit cards.

**No arms-length dealings between entities**

125. The business relationships among the Debtor and Affiliated Defendants were not negotiated or carried on at "arms length".

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

126.    The Debtor and Affiliated Defendants routinely performed services and exchanged funds in the absence of formal written agreements or in disregard of the terms of existing written agreements.

127.    As an example, for some time, the Debtor and RHM discharged wastewater onto land owned by SSC Farming, SSC I and SSC II without any contractual relationship between the parties.  Eventually, "discharge agreements" were drafted, but the terms of those agreements were never enforced and payments purportedly under those discharge agreements were made on an ad hoc basis whenever the Defendants holding title to the land needed funds.

128.    At the direction of Salyer and/or the SSR Trust and/or others acting on their behalf or in concert with them and using confidential information, SSC Farming, SSC I and SSC II purportedly terminated the discharge agreements for the purpose of enhancing their own bargaining position vis-à-vis the Debtor and RHM during the anticipated sale of the Debtor's operating assets.  Salyer and/or the SSR Trust caused the termination of the discharge agreements for their own personal benefit and in disregard of the harm to the Debtor.  As a result, Salyer, the SSR Trust, SSC Farming, SSC I and SSC II received in excess of $1.2 million from the Debtor in order to allow for the sale of the Debtor's operating assets.

129.    The pricing of products or services provided by one entity to another was not negotiated, but rather, was set by Salyer who controlled both parties.

130.    In addition, Salyer from time to time retroactively reset prices charged to SK Foods by the other Defendants.  For instance, near the end of 2008, when SSC III and SS Farms were losing money, Salyer unilaterally caused SSC III and SS Farms to bill SK Foods amounts in excess of the amounts called for in the existing agreements.

131.    As a further example, although CSSS provided the fiber drums and rail trans-loading for SK Foods, there was no contract describing the terms of this relationship.

132.    As a further example, Salyer American Fresh Foods was nominally the lessee on the DAX software system.  SK Foods paid the vast majority of the initial set up costs and subsequent lease payments. Further, the software ran on servers and computers that SK Foods

PHDATA 3265645_3

Adversary Complaint

owned and maintained. Yet, there were no written agreements among Salyer American Fresh Foods, SK Foods and the other Defendants for the use of the software and computer system.

133.    As a further example, in April 2008, Salyer withdrew $1.7 million from SS Farms and deposited those funds into his personal account. On information and belief, he represented that he was using those funds to pay down a note on which SSC Farming was an obligor, and that by paying off this note, the SSC Farming land could be used as collateral for a separate loan to another Salyer entity, Salyer American Fresh Foods.

134.    Debtor and RHM paid in excess of $1 million annually to SKF Aviation purportedly as advance payment for future business flights for SK Foods' employees. However, upon information and belief, neither SK Foods nor SKF Aviation kept records of the number of flights provided, the business purposes of each flight or the actual allocated expense of using the aircraft.

135.    In many cases in which invoices were generated by a related party, SK Foods overpaid those invoices. Based on information known to date, more than $2,300,000 was transferred to related parties through overpaid invoices.

136.    Upon information and belief, the relationships between Debtor and all the Affiliated Defendants were governed in a similar fashion; that is, without any arms-length negotiations or adherence to contractual terms based on the conduct of the affairs of the different entities as a single enterprise as described above.

**Intercompany transfers and commingling of assets**

137.    SK Foods effectively served as the bank for the Affiliated Defendants, dispensing funds when necessary for their operation and without regard to whether SK Foods received goods or services with a value reasonably equivalent to the money transferred by SK Foods to the Affiliated Defendants.

138.    Upon information and belief, the Affiliated Defendants did not follow or adhere to corporate formalities in connection with the various transfers of funds, major purchases, performance of services, or divestitures of assets.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

139.     Historically, there were a significant number of related party transactions in which funds or other assets were diverted from the Debtor to related parties without an adequate explanation.  SK Foods regularly issued checks to Affiliated Defendants, and Affiliated Defendants regularly issued checks to each other and/or to SK Foods without documentation substantiating the purpose of the payment.

140.     Money regularly was transferred back and forth between and among Salyer-related Defendants when an entity needed money, not necessarily when it was due under a contract or when an entity provided goods or services to Debtor.

141.     At various times, SK Foods provided "loans" to SK Frozen Foods, SKF Aviation, SK Farms Services, and others.

142.     Salyer sometimes sought to have the payments by Affiliated Defendants to SK Foods characterized as "loans" from the Affiliated Defendants to SK Foods even though SK Foods was the source of the funds initially.

143.     According to financial statements, as of June 30, 2007, transactions by SK Foods with certain of the Affiliated Defendants and others resulted in current related-party receivables of $18,714,000 and non-current related party receivables of $22,070,000.  Outstanding debts as of that time included transactions with SK Foods, LLC, RHM, Blackstone, SKF Aviation, SS Farms, SSC Farming, certain Foreign Entities and CSSS, among others.  As of June 30, 2008, transactions by SK Foods with certain of the Affiliated Defendants and others resulted in current related-party receivables of $13,534,000 and non-current related party receivables of $22,406,000.

144.     As an example of intercompany transfers and non-arms length dealing, SSC Farming which holds title to land for growing tomatoes and for wastewater discharge, owed approximately $12 million to SK Foods as of December 31, 2007 due to intercompany transfers received from SK Foods.  That amount included $1.5 million that SK Foods paid to a title company for the benefit of SSC Farming in order for SSC Farming to purchase land used for waste water by RHM.  SK Foods also provided $700,000 for the purchase of another parcel of land to which SSC Farming holds title.  There was no rational business purpose for SK Foods to

PHDATA 3265645_3

Adversary Complaint

provide the funds to SSC Farming to purchase land and thereafter agree to pay yearly discharge fees to SSC Farming equal to the initial cost of purchasing fee title to the land. SK Foods could have taken title to the land and eliminated unnecessary and above market discharge fees, and maintain its own control over the land.

145. Based on its dealings with the SSC Entities (which owned land for growing tomatoes and for wastewater discharge) and with SS Farms for harvesting, there was no legitimate business reason for SK Foods to transfer vast sums of money to SSC Farming such that SSC Farming owes in excess of $12 million to SK Foods.

146. As another example, SK Foods entered into an agreement with Westlands Water District to purchase certain parcels of land uniquely situated to SK Foods' processing facility in order to receive waste water discharge. After the contract was negotiated but prior to closing, Salyer and SKPM arranged for SSC I and SSC II to take title to the property. SSC I and SSC II did not provide any consideration to SK Foods for this purported assignment of the rights to purchase this land, the assignment was not documented, and the funds to purchase that land came from yet other Defendants. There was no benefit to, or legitimate business purpose associated with, SK Foods allowing SSC I and SSC II taking title to the waste water discharge land, which in fact was to SK Foods' detriment.

147. As another example of intercompany transfers, SK Foods "borrowed" $4 million from SS Farms at the end of 2006. SK Foods then paid the $4 million to SSC Farming. SSC Farming was supposed to use the funds to pay down a line of credit, which had no benefit to SK Foods.

148. As another example of intercompany transfers, in November 2005, SK Foods paid $3 million to SSC Farming for the purpose of paying down a line of credit with Wells Fargo held by SSC Farming, SS Farms and Blackstone.

149. As another example of intercompany transfers, in December 2006, SK Foods transferred $4 million through the SSR Trust to RHM and SKF Aviation allowing them to make tax prepayments.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

150.    As further examples of intercompany transfers, SK Foods paid invoices for liabilities incurred by Affiliated Defendants, reimbursed Affiliated Defendants and Owner Defendants for costs spent on tenant improvements at the headquarters locations in Monterey, and provided funding to certain related Defendants to repay intercompany liability of other related Defendants, with no benefit to the Debtors.

151.    Salyer directed and caused SK Foods to make payments to various Affiliated Defendants for "prepaid expenses," which were the functional equivalent of intercompany transfers. The payments generally were made at the end of December for services or goods to be provided in the following year. However, on information and belief, the amounts of the "prepaid expenses" were arbitrarily determined based on Salyer's perceived personal tax advantages rather than for SK Foods' legitimate business purposes.

152.    Although the payments nominally were for "prepaid expenses," it was common for the Affiliated Defendants to return the funds to SK Foods within the first few weeks of January or to pay the monies to another Affiliated Defendant based on the Affiliated Defendant's need for funds. In short, for certain payments for "prepaid expenses," SK Foods in fact did not prepay any actual expenses despite the characterization of the transfers.

153.    For example, SK Foods commonly made such prepayments to SS Farms in the last week in December, which then returned the funds to SK Foods in January. SS Farms booked its return of these funds as "loans" to SK Foods.

154.    In December 2007, SK Foods paid $9 million for "prepaid expenses" to SS Farms for future services even though there was no contract between SK Foods and SS Farms. SS Farms did not send invoices to SK Foods prior to 2008.

155.    As another example, in December 2007, SK Foods paid $6 million to SK Farms Services for "prepaid expenses" for future services. SK Farms Services was a new entity purportedly created to make bulk purchases on behalf of the Debtors and the Affiliated Defendants. SK Farms Services had otherwise not been capitalized. On information and belief, Salyer had SK Foods transfer the $6 million to reduce his taxes for 2007.

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

156. However, in February 2008, SK Foods needed funds to pay down its loan with its secured lenders. Because SK Foods did not have the funds to do so, Salyer caused SK Farms Services to transfer the $6 million to SSC Farming, which in turn transferred the $6 million back to SK Foods.

157. SK Farms Services recorded the $6 million transfer to SSC Farming as a loan. Salyer wanted the $6 million payment from SSC Farming to SK Foods also booked as loan from SSC Farming. However, SK Foods' Chief Financial Officer at the time refused because SSC Farming owed SK Foods in excess of $6 million on account of inter-company transfers and other claims. Thus SSC Farming and SK Foods treated SSC Farming's $6 million transfer as a payment on account of SSC Farming's indebtedness owed to SK Farms.

158. SK Farms Services never at any time performed bulk purchasing for SK Foods or any other entity. SK Farms Services was never capitalized and has no assets except for its $6 million receivable from SSC Farming.

159. As another example of prepaid expenses, SK Foods paid $1.5 million to SKF Aviation in December 2007 for aviation transportation to be provided in 2008. On information and belief, there are no records or logs of flights presented to SK Foods to show whether and to what extent the prepaid expenses in fact were utilized, who flew on the aircraft, or the purpose of the flights. Salyer used the aircraft repeatedly in 2008, including for his personal use. On information and belief, at the direction of Salyer, SK Foods directly or through the Affiliated Defendants paid arbitrary amounts to SKF Aviation to enable SKF Aviation to fund Salyer's use of its aircraft.

160. SK Foods and the Defendants documented and treated transfer of funds among themselves differently than transactions with other creditors.

161. The Debtor and Affiliated Defendants generally did not document whether the "transfers," "loans," or "prepaid expenses" were repaid. Nor was there billing associated with the alleged prepaid expenses to track the extent to which the Debtor in fact received services or goods applied against the prepayments or associated with the loans to track whether they were being repaid.

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

162.    Payment of inter-company obligations was frequently deferred and, if paid at all, "caught up" at various intervals, often at the end of a tax year.

163.    Based on information known to date, between January 2005 and February 2009, more than $170,000,000 was transferred from SK Foods to related parties, whereas less than $37,000,000 flowed into SK Foods from those related parties.  During this time period, therefore, there was a net value of transactions from SK Foods to related parties of more than $133,000,000.

164.    Based on information known to date, between January 2005 and February 2009, the following total values were recorded for transactions from SK Foods to the identified related party:

| | | |
|---|---|---|
| a. | SS Farms: | $101,113,000 |
| b. | CSSS: | $16,153,000 |
| c. | SKF Aviation: | $13,560,000 |
| d. | SSR Trust: | $6,367,000 |
| e. | SK Farms Services: | $6,005,000 |
| f. | SKPM: | $2,458,000 |
| g. | SSC Farming: | $2,199,000 |
| h. | Cedenco Australia: | $1,700,000 |
| i. | Blackstone: | $918,000 |
| j. | Cedenco: | $800,000 |
| k. | SK Australia: | $247,000 |
| l. | SK International: | $241,000 |
| m. | SMC: | $165,000 |

These amounts do not include payments by SK Foods characterized as "investments" in these entities, which additional payments or "investments" are described below.

165.    Based on a review of SK Foods' general ledger, between January 1, 2000 and the present, more than $434 million in transactions took place from SK Foods to the named defendants and certain other related parties, whereas there were less than $219 million in

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

1  transactions into SK Foods from those same parties.  During this time period, therefore, there

2  was a net value of transactions from SK Foods to these related parties of more than $215 million.

3  A summary of these transactions is set forth on Exhibit A, attached hereto.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

**Attempted Reconciliation**

166.    SK Foods itself attempted to reconcile these various intercompany transactions when various lenders started questioning the practices. Despite many months of attempting to track all such transactions and the underlying reasons for such transactions, SK Foods ultimately determined it was not possible to determine the purposes for all the transactions and to reconcile the books.

167.    Management was not able to determine the purposes of various transactions because there was often no backup for the transfers. For instance, when checks were used, generally there were no check requests or other documentation. When wire transfers were used, amounts transferred were rounded up, again without backup.

168.    In sum, even when money could be followed from one entity to another, the underlying purposes of the transactions generally could not be determined.

169.    At the end of February 2008, Debtor and Affiliated Defendants transferred funds among each other in an effort to balance the intercompany transfers, despite a lack of understanding for the purposes of the transactions.

170.    At the conclusion of that process, SK Foods was left with approximately $9 million in unpaid receivables because the Affiliated Defendants had insufficient capital to repay their obligations.

**Investment in and Subsequent "Divestiture" of the Foreign Entities**

171.    SK Foods sought to diversify its operations and access foreign markets by expanding to New Zealand and Australia, whose growing seasons are opposite of that of California. Cedenco Foods Limited ("Cedenco"), Cedenco Ohakune and SK Foods International managed operations in New Zealand similar to those of SK Foods, while Cedenco JV, Cedenco Australia Partnership and SK Foods Australia managed similar operations in Australia. Those entities are engaged in tomato processing and the dehydration of various kinds of vegetables.

172.    SK Foods paid the purchase price and associated expenses to acquire the equity interests in the Foreign Entities. Therefore, SK Foods initially owned (directly or indirectly) the Foreign Entities.

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

173. In 2001, SK Foods formed and became a member of SK Foods, LLC, which then formed and became the 100% shareholder of SK Foods International.

174. In a series of transactions from May 2001 to September 2003, SK Foods International purchased all of the common stock of Cedenco.

175. In 2002, SK Foods formed and became the sole stockholder of SK Foods Australia.

176. In March 2002, SK Foods Australia purchased a 50% interest in Cedenco Australia. The other 50% interest in Cedenco Australia was held by Cedenco JV, which was a wholly-owned subsidiary of Cedenco, until March 2004 when it was sold to SK Foods Australia.

177. In November 2005, Cedenco acquired the business and certain assets of Sunrise Coast New Zealand, as well as 100% of the common stock of Sunrise Coast Japan. The businesses were transferred to a new corporation called Sunrise Coast. Both Sunrise Coast entities, as well as the new corporation are 100% owned subsidiaries of Cedenco.

178. In November 2005, SK Foods International acquired 56.25% of what is now Cedenco Ohakune.

179. SK Foods provided capital to fund the Foreign Entities' operations.

180. The ownership and operation of the Foreign Entities reportedly helped establish an international reputation for SK Foods, and SK Foods had a management group specifically focused on maintaining and growing SK Foods' international activity.

181. In or about December 2007, SK Foods owned the Foreign Entities as a result of having expended the funds both to purchase and operate those entities.

182. Salyer, SKPM, and/or others working at Salyer's direction caused SK Foods to transfer ownership of the Foreign Entities to other entities without consideration or benefit to SK Foods. Further, they purported to "back date" the transfer to November 1, 2006. On information and belief, the transaction documents were executed well after November 2006 and within two years of the date of the Petition.

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

183. Given the assets owned and operated by the Foreign Entities and the purpose of purchasing the Foreign Entities, the divestiture was not in the best interests of SK Foods and did not serve a legitimate corporate purpose.

184. At the time of the divestiture, the Foreign Entities owed SK Foods $18 million, which was net of $10 million that SK Foods owed to the Foreign Entities  (The Foreign Entities thus owed a total of $28 million to SK Foods.)

185. According to Consolidated Financial Statements for SK Foods issued for the eight month period ending June 30, 2007 and dated January 15, 2008, SK Foods "sold the Partnership's inter-company receivables to a revocable trust with common ownership with the Partnership." SK Foods documented the transfer pursuant to a Debt Assignment Agreement.

186. The revocable trust referenced in SK Foods financial statements is the SSC&L 2007 Trust ("SSC&L") which is a trust created by Salyer. "SSC&L" is an acronym for Scott [Salyer], Stephanie [Salyer], Caroline [Salyer], and Louie. "Louie" is Salyer's dog.

187. The Debt Assignment Agreement identified Cedenco's address as P.O. Box 160, Lemoore, California, Attn: Mark McCormick.  Scott Salyer signed the Debt Assignment Agreement on behalf of Cedenco, the SSC&L Trust and SK Foods.

188. On information and belief, SSC&L has no, and never had, operations, revenues, or assets.

189. On information and belief, SSC&L did not pay any money to SK Foods for the inter-company receivables, which has a value of at least $18,293,000.

**Salyer's Transfer Of The Drum Line**

190. At the direction of Salyer and/or SKPM and/or the SSR Trust or those acting under their direction and control, a valuable asset – "the Drum Line" – was transferred out of the country for no consideration and in violation of injunctions issued by this Court.

191. SK Foods used fiber drums in connection with its transport and processing of tomatoes.  SK Foods owns a commercial drum manufacturing line ("the Drum Line") that it used to produce the fiber drums used in its processing facilities.  The Drum Line has a value of at least $350,000.

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

1   192.   Salyer, SKPM, and SSR Trust did not attempt to market the Drum Line to

2   unrelated third parties in an effort to maximize the sales price even though the Debtor was in

3   financial distress.

4   193.   At or around the date of the Petition, the Defendants disassembled and moved the

5   Drum Line from SK Food's premises to a location owned and or controlled by CSSS.

6   194.   SK Foods and CSSS executed a Purchase and Sale Agreement and a Promissory

7   Note, by which SK Foods purported to sell the Drum Line to CSSS and CSSS purported to buy

8   the Drum Line from SK Foods. CSSS did not pay SK Foods anything for the Drum Line;

9   instead SK Foods gave CSSS a Promissory Note, in the amount of $350,000. No payment was

10  required to be made by CSSS to SK Foods under the Note until December 31, 2009, and the

11  payment due then is only interest on the note, calculated at a fixed rate of 5% per annum.

12  Thereafter, only interest payments were required to be made until the Promissory Note came due

13  on June 1, 2013.

14  195.   Salyer signed the Purchase and Sale Agreement as Chief Executive Officer of

15  SKPM.

16  196.   Gerard Rose, a purported trustee for SAS Trust and CGS Trust (the putative

17  owners of CSSS), signed the Purchase and Sale Agreement on behalf of CSSS.

18  197.   Gerard Rose is an attorney having provided services for SK Foods and the

19  Defendants. Mr. Rose was retained by Salyer and regularly took instruction from Salyer and

20  other officers of SK Foods.

21  198.   The Purchase and Sale Agreement did not represent an arms-length transaction,

22  and the terms did not represent market rates and terms.

23  199.   CSSS did not have the resources to pay for the Drum Line at the time the

24  Purchase and Sale Agreement was executed and did not have any reasonable or realistic prospect

25  of being able to pay for the Drum Line.

26  200.   The Purchase and Sale Agreement was not negotiated in good faith.

27

28

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

201. On information and belief, the Purchase and Sale Agreement was executed around the time of the petition but back-dated to December 1, 2008 in order to conceal the true date of the purported transaction.

202. As of the Petition Date, the purported sale of the Drum Line by SK Foods to CSSS had not been reflected in the financial records of SK Foods.

203. On August 24, 2009, this Court entered a temporary restraining order to prevent shipment of the Drum Line out of California. The Court then entered a preliminary injunction on September 3, 2009 ("Injunction") to enjoin shipment of the Drum Line to any location outside of California.

204. Despite the Injunction, the Drum Line was shipped at Salyer's direction to New Zealand.

205. The shipping documents list Affiliated Defendant Monterey Peninsula Farms ("Monterey") as the shipping party, which is not a party to the Purchase and Sale Agreement. The majority owner of Monterey is SSC Farming, whose majority owner is the SSR Trust, whose sole beneficiary is Salyer.

206. In litigation concerning the Drum Line, CSSS could not produce a witness who was knowledgeable concerning the identity of the individual who authorized the shipment of the Drum Line to New Zealand, claimed to have no employees and claimed no ongoing operations.

207. The Drum Line presently is in possession of a company in New Zealand called K-Pack, which was the original manufacturer of the Drum Line. On information and belief, Salyer intended to refurbish the Drum Line and sell it for his personal benefit.

208. The transfer of the Drum Line is representative of intercompany movement of assets, the interchangeable nature of corporate entities, and Salyer's control. It also is representative of Salyer's willingness to act to the detriment of the Debtor in order to benefit himself and the Defendants and entities that he controls.

**The Failed Chili Pepper Venture**

209. SK Foods funded the purchase of RHM's facility in 2003.

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

210.   SK Foods paid for all assets and operations of RHM.  RHM was never capitalized and was always insolvent.  RHM had no customers other than SK Foods.

211.   In or about 2003, Debtor sought to diversify its product offerings and increase utilization of RHM's processing facility by processing chili peppers, which had a different growing season than tomatoes.

212.   From 2003 through 2008, SK Foods expended significant sums in an effort to have RHM develop the capability of processing chili peppers.

213.   In 2003 and 2004, RHM contracted for the use of a canning line from General Mills and invested approximately $15-16 million to make it operational.

214.   In 2005, RHM spent millions of dollars to purchase five used evaporators.  In 2006, RHM began remanufacturing operations, a further step in processing the product for retail sale, which was beyond what SK Foods historically did.

215.   In 2007, RHM began its effort to process chili peppers.

216.   Due to the shapes and colors of chili peppers, RHM could not develop the mechanical capabilities to pick and sort chili peppers with the efficiency that it picked and sorted tomatoes.

217.   In 2007 and 2008, the Debtor invested significant sums to modify and rebuild the processing lines two times in at attempt to increase the efficiency of the automated sorting process.

218.   During the first harvest in or about April 2007, RHM was unable to properly process the chili peppers (e.g., peppers were damaged and became unusable), and substantially all of the chili production had to be discarded.  SK Foods, who owned the inventory, experienced approximately $2 million in losses as a result.

219.   During the following season in October-November 2007, RHM imported the chile peppers from Mexico at double the normal cost because there were no chili peppers available in Northern California  That season, RHM processed enough chili peppers to satisfy the demand for the entire country for a year.  However, many of the chili peppers spoiled or disintegrated due to the passage of time from harvest in Mexico to processing in Colusa, California.  After SK Foods

PHDATA 3265645_3

Adversary Complaint

incurred significant production costs, many customers refused to purchase the product because of the poor quality. One of the customers (B&G) also refused to pay SK Foods $1 million in true-up costs.

220.    During the next season in March-April 2008, RHM improved its mechanical processing, obtained local chili peppers, and processed a three to four year national supply of chili peppers. The customers, however, refused to purchase them. Due to the quality problems in the prior season and failure to meet contractual commitments, the customers made commitments with other suppliers. Overall, Debtor lost more than $20 million from the chili peppers business.

**Insolvency**

221.    On information and belief, the Debtor became insolvent no later than the Fourth Quarter 2007 and perhaps earlier.

222.    Beginning in or about June 2007, the Debtor's banks began to exercise dominion over the Debtor's bank accounts and funds were released from the Debtor's bank accounts only with approval of the banks.

223.    The notes to the audited financial statements for SK Foods for the eight months ending June 30, 2007, audited by Moss-Adams LLP, disclose that the Partnership "was not in compliance with certain covenants, including the funded debt to operating cash flow ratio, and the fixed charge coverage ratio" for its bank line of credit, short-term borrowings, and long-term debt.

224.    The same financial statements identified $18.7 million in current related-party receivables and $22 million in non-current related party receivables, as well as current related party payables of $14.048 million and non-current related party payables of $4.299 million. However, the audited financial statements concluded that "[i]t is not practical to estimate the fair value of related-party receivables or debt due to related parties, due to the nature of these items."

225.    On information and belief, the property, plant, and equipment ("PPE") on the Moss-Adams financial statements were overvalued because the PPE was already used when purchased, with the PPE continuing to age and depreciate in value while in continued operation.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

Adversary Complaint

PHDATA 3265645_3

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

226. The Debtor lost millions of dollars as a result of the intercompany transfers and prepaid expenses to the Defendants described above.

227. In or about September 2007, the Debtor refinanced its debt, increasing both its term debt and its revolving loans.

228. At or about the same time, the banks and certain financial personnel of the Debtor advised Salyer that he needed to stop his exorbitant monthly expenses given the Debtor's financial condition. He failed and refused to do so.

229. The Debtor lost hundreds of thousands of dollars, if not millions of dollars, due to improper expenses charged by Salyer, which were funded directly or indirectly by the Debtor.

230. As set forth above, the Debtor lost millions of dollars from the failed chili peppers venture.

231. In April 2008, the Federal Bureau of Investigation raided the Debtor's operations in connection with its investigation of alleged price fixing and bribery by the Debtor and/or employees of the Debtor. The FBI seized various records belonging to the Debtor pursuant to search warrants and subpoenas. The raid was well-publicized and caused many customers of the Debtor to discontinue purchases from the Debtor of tomato products, materially depressing revenues.

**Identification of Certain Transfers of Assets and Funds**

232. According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to SMC[3]:

| Date | Amount | Description in General Ledger |
|------|--------|-------------------------------|
| 12/31/2008 | $104,621 | Liabilities |
| 2/10/2009 | $82,300 | Liabilities |
| 2/27/2009 | $82,300 | Liabilities |

---

[3] The allegations in paragraphs 232 through 241 are based on entries in SK Foods' general ledger. For the reasons outlined in footnote 2, the Trustee has not been able to confirm these entries through other records. The Trustee reserves the right to amend and/or supplement these allegations as appropriate, and reserves the right to identify and pursue other transfers not identified here.

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

233.   According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to the SSR Trust:

| Date | Amount | Description in General Ledger |
|---|---|---|
| 12/28/2007 | $750,000 | Capital – S. Salyer, Revocable Trust |
| 12/30/2007 | $500,000 | Rent/Lease – Bins/Drums |
| 12/28/2008 | $1,000,000 | |
| 4/14/2008 | $500,000 | Capital – S. Salyer, Revocable Trust |
| 4/14/2008 | $100,000 | Capital – S. Salyer, Revocable Trust |
| 4/14/2008 | $50,000 | Capital – S. Salyer, Revocable Trust |
| 6/16/2008 | $210,000 | Capital – S. Salyer, Revocable Trust |
| 9/15/2008 | $240,000 | Capital – S. Salyer, Revocable Trust |
| 12/30/2008 | $250,000 | Accounts Payable – Related Party |
| 12/30/2008 | $225,000 | Accounts Payable – Related Party |
| 12/30/2008 | $650,000 | Capital – S. Salyer, Revocable Trust |

234.   According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to SK Frozen Foods:

| Date | Amount | Description in General Ledger |
|---|---|---|
| 6/12/2008 | $292,875 | Accounts Receivable – Related Parties |
| 9/26/2008 | $586,244 | Accounts Payable – Related Party |
| 1/20/2009 | $59,718 | Accounts Receivable – Related Parties |
| 2/25/2009 | $51,628 | Accounts Payable – Related Party |

235.   According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to SKPM:

| Date | Amount | Description in General Ledger |
|---|---|---|
| 1/28/2008 | $2,298,396 | I/C CASH – SKPM CORP |

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

| 11/25/2008 | $126,191 | Accounts Payable – Related Party |

236. According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to SS Farms:

| Date | Amount | Description in General Ledger |
|------|--------|-------------------------------|
| 9/3/2007 | $278,924 | CLEARING ACCOUNT |
| 9/3/2007 | $235,880 | CLEARING ACCOUNT |
| 9/3/2007 | $115,026 | CLEARING ACCOUNT |
| 9/4/2007 | $1,103,041 | GROWER FEES WITHHELD |
| 9/4/2007 | $359,061 | RAW MATERIAL INVENTORY - PROCESSED |
| 10/2/2007 | $1,052,333 | GROWER FEES WITHHELD |
| 10/2/2007 | $1,021,887 | GROWER FEES WITHHELD |
| 10/2/2007 | $372,112 | RAW MATERIAL INVENTORY - PROCESSED |
| 10/2/2007 | $360,864 | RAW MATERIAL INVENTORY - PROCESSED |
| 10/12/2007 | $286,531 | CLEARING ACCOUNT |
| 10/12/2007 | $98,913 | CLEARING ACCOUNT |
| 10/16/2007 | $1,119,279 | GROWER FEES WITHHELD |
| 10/16/2007 | $399,587 | RAW MATERIAL INVENTORY - PROCESSED |
| 10/26/2007 | $171,760 | CLEARING ACCOUNT |
| 10/26/2007 | $102,774 | CLEARING ACCOUNT |
| 10/26/2007 | $71,557 | CLEARING ACCOUNT |
| 11/1/2007 | $433,037 | CLEARING ACCOUNT |
| 11/1/2007 | $150,565 | CLEARING ACCOUNT |
| 11/6/2007 | $130,263 | CLEARING ACCOUNT |
| 11/6/2007 | $83,497 | CLEARING ACCOUNT |
| 11/6/2007 | $70,139 | CLEARING ACCOUNT |
| 11/6/2007 | $56,341 | CLEARING ACCOUNT |
| 11/6/2007 | $52,847 | CLEARING ACCOUNT |
| 11/8/2007 | $169,904 | CLEARING ACCOUNT |
| 11/8/2007 | $114,310 | CLEARING ACCOUNT |
| 11/8/2007 | $94,449 | CLEARING ACCOUNT |
| 11/8/2007 | $68,024 | CLEARING ACCOUNT |
| 11/8/2007 | $63,293 | CLEARING ACCOUNT |
| 11/16/2007 | $1,027,111 | GROWER FEES WITHHELD |
| 11/16/2007 | $398,680 | INTEREST EXP PAYABLE AFFILIATED LT |
| 11/16/2007 | $110,953 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $97,861 | RAW MATERIAL INVENTORY |

35

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

| | | |
|---|---|---|
| | | - PROCESSED |
| 11/16/2007 | $97,686 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $97,104 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $96,383 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $94,244 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $93,318 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $92,861 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $92,029 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $86,231 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $85,066 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $75,744 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $75,692 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $74,148 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $73,321 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $68,608 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $66,159 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $62,425 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $61,795 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $60,099 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $57,500 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $57,300 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/28/2007 | $318,623 | ACCOUNTS PAYABLE - ACCRUED |
| 11/28/2007 | $112,213 | ACCOUNTS PAYABLE - ACCRUED |
| 12/14/2007 | $405,078 | RAW MATERIAL INVENTORY - PROCESSED |

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

| Date | Amount | Description |
|---|---|---|
| 12/20/2007 | $369,568 | RAW MATERIAL INVENTORY - PROCESSED |
| 1/3/2008 | $1,049,863 | GROWER FEES WITHHELD |
| 1/3/2008 | $884,318 | GROWER FEES WITHHELD |
| 1/3/2008 | $666,470 | GROWER FEES WITHHELD |
| 1/3/2008 | $336,698 | RAW MATERIAL INVENTORY - PROCESSED |
| 1/3/2008 | $285,889 | RAW MATERIAL INVENTORY - PROCESSED |
| 1/15/2008 | $5,428,708 | I/C CASH - SS FARMS |
| 1/31/2008 | $4,000,000 | ACCOUNTS PAYABLE - ACCRUED |
| 3/17/2008 | $550,000 | ACCOUNTS PAYABLE - ACCRUED |
| 3/18/2008 | $225,361 | |
| 3/27/2008 | $100,000 | UNKNOWN |
| 4/1/2008 | $275,000 | UNKNOWN |
| 4/7/2008 | $300,000 | UNKNOWN |
| 4/8/2008 | $191,462 | UNKNOWN |
| 5/9/2008 | $500,000 | paydown loan -SSF |
| 5/14/2008 | $600,000 | paydown loan -SSF |
| 5/15/2008 | $200,000 | paydown loan -SSF |
| 5/28/2008 | $355,764 | paydown ssf note |
| 5/28/2008 | $50,000 | paydown ssf note |
| 6/4/2008 | $300,000 | paydown note SSF |
| 6/6/2008 | $500,000 | ST (90 day) Notes Receivable SSF |
| 6/6/2008 | $180,068 | Notes Payable SSF pay off |
| 7/1/2008 | $191,765 | Notes Payable SSF pay off |
| 8/4/2008 | $1,000,000 | PAYOFF 7/21 SSF LOAN TO SKF $1.5M 8/4 |
| 8/6/2008 | $51,490 | PMT ACCRUED INTEREST SSF 8/6 |
| 8/14/2008 | $1,599,179 | |
| 8/22/2008 | $1,507,034 | |
| 8/28/2008 | $1,557,675 | |
| 9/16/2008 | $1,134,298 | 08WK7HAUL-SKF&CCC90% |
| 9/29/2008 | $2,691,813 | |
| 10/7/2008 | $1,562,493 | |
| 10/14/2008 | $1,500,796 | |
| 10/17/2008 | $1,458,232 | |
| 10/23/2008 | $1,353,144 | |
| 10/24/2008 | $102,636 | |
| 10/28/2008 | $1,054,284 | |
| 10/30/2008 | $85,138 | Grower Payments 11-3-08 |
| 11/4/2008 | $440,434 | 08WK15HAUL-SKF&CCC90% |
| 11/4/2008 | $131,499 | 08WK16HAUL-SKF&CCC90% |
| 11/4/2008 | $81,517 | water purchase |

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

| Date | Amount | |
|------|--------|---|
| 11/5/2008 | $318,840 | Pepper Harvest |
| 11/5/2008 | $163,216 | Pepper Harvest |
| 11/13/2008 | $603,198 | |
| 1/2/2009 | $600,000 | GLV-000006739 |
| 1/12/2009 | $500,000 | ST Advance pymt Rltd Pty SSF |
| 1/14/2009 | $1,500,000 | ST Advance Receipt Rltd Pty SSF |
| 1/14/2009 | $756,000 | ST Advance Receipt Rltd Pty SSF |
| 1/14/2009 | $500,000 | |
| 2/27/2009 | $1,025,000 | Repayment of Short term Borrowings 1mm & 25k |

237.    According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to SSC Farming:

| Date | Amount | Description in General Ledger |
|------|--------|-------------------------------|
| 10/18/2007 | $75,000 | Other Long Term Assets |
| 7/24/2008 | $100,000 | Accounts Payable – Related Party |
| 7/25/2008 | $50,000 | Rent/Lease – General |
| 8/7/2008 | $150,000 | Accounts Payable – Related Party |
| 8/20/2008 | $464,866 | Accounts Payable – Growers |
| 10/13/2008 | $77,201 | RAW TOMATOES CONVENTIONAL |
| 10/20/2008 | $85,160 | RAW TOMATOES CONVENTIONAL |
| 11/11/2008 | $316,000 | Accounts Payable – Related Party |

238.    According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to the SSC I:

| Date | Amount | Description in General Ledger |
|------|--------|-------------------------------|
| 8/6/2008 | $160,000 | Accounts Payable – Related Party |
| 2/20/2008 | $66,357 | Accounts Payable – Growers |
| 8/26/2008 | $235,813 | Accounts Payable – Growers |
| 9/15/2008 | $65,606 | Accounts Payable – Growers |
| 11/11/2008 | $187,925 | Accounts Payable – Related Party |
| 11/13/2008 | $149,148 | Accounts Payable - Growers |

PHDATA 3265645_3

Adversary Complaint

239. According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to SSC II:

| Date | Amount | Description in General Ledger |
|------|--------|-------------------------------|
| 8/6/2008 | $230,000 | Accounts Payable – Related Party |
| 8/20/2008 | $300,043 | Accounts Payable – Growers |
| 8/26/2008 | $345,685 | Accounts Payable – Growers |
| 10/24/2008 | $99,191 | Accounts Payable – Growers |
| 10/30/2008 | $119,183 | Accounts Payable – Growers |
| 10/30/2008 | $110,318 | Accounts Payable – Growers |
| 11/11/2008 | $161,531 | Accounts Payable – Related Party |
| 11/13/2008 | $325,366 | Accounts Payable -- Growers |

240. According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to SSC III:

| Date | Amount | Description in General Ledger |
|------|--------|-------------------------------|
| 10/14/2008 | $270,696 | Accounts Payable – Growers |
| 10/30/2008 | $282,620 | Accounts Payable – Growers |
| 11/13/2008 | $833,255 | Accounts Payable -- Growers |

241. The above-referenced transfers are collectively referred to herein as the "Transfers." The Trustee reserves the right to identify and pursue other transfers where appropriate.

### Count I:  *Avoidance of Preferential Payments Pursuant to 11 U.S.C. §547*

242. The Trustee incorporates by reference the preceding paragraphs of this Complaint as though set forth fully herein.

243. The Transfers were transfers of Debtor's property to creditors of Debtor and made while Debtor was insolvent.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

244. The Transfers were made on account of antecedent debts owed by SK Foods before the Transfers were made.

245. Defendants are "insiders" as that term is defined in the United States Bankruptcy Code.

246. Many of the Transfers (all transfers dated May 5, 2008 to the present) were made within one year of the Petition Date.

247. The Transfers enabled the recipients to receive more than they would have received if the Transfers had not been made, if the case were filed under Chapter 7 and if Defendants were paid in accordance with the Bankruptcy Code.

248. No new or additional value was given contemporaneously with the Transfers.

249. The Transfers were not in payment of a debt incurred in the ordinary course of Debtor's business affairs, and were not made according to ordinary business terms.

250. Defendants are liable for the return of the assets transferred as avoidable preferences pursuant to Section 547(b) of the Bankruptcy Code.

WHEREFORE, the Trustee prays for a judgment as set forth below.

### *COUNT II: Avoidance of Fraudulent Transfers Pursuant to 11 U.S.C. §548*

251. The Trustee incorporates by reference the preceding paragraphs of this Complaint as though set forth fully herein.

252. The Transfers were transfers of Debtor's property.

253. The Transfers were made within two years of the Petition Date.

254. The Transfers were made with actual intent to hinder, delay, or defraud entities to which SK Foods was or became indebted.

255. Debtor received less than a reasonably equivalent value in exchange for the Transfers.

256. Debtor was insolvent on the date of the Transfers or became insolvent as a result of the Transfers.

257. Debtor was engaged in business for which the property remaining with the Debtor was an unreasonably small capital.

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

258.    Debtor intended to incur or believed that it would incur debts that would be beyond its ability to pay.

259.    Defendants are liable for the return of the Transfers pursuant to 11 U.S.C. § 548 of the Bankruptcy Code.

WHEREFORE, the Trustee prays for a judgment as set forth below.

**COUNT III:  *Avoidance of Fraudulent Transfers Pursuant to***

***11 U.S.C. §§ 544(b) and 550(a) and California Civil Code §§ 3439.07, 3439.04 and 3439.05***

260.    The Trustee incorporates by reference the preceding paragraphs of this Complaint as though set forth fully herein.

261.    The Transfers were transfers of Debtor's property.

262.    The Transfers were made within four years of the date this Complaint was filed.

263.    The Transfers were made without SK Foods receiving a reasonably equivalent value from the Defendants in exchange for the Transfers.

264.    SK Foods was insolvent on the date of the Transfers or became insolvent as a result of the Transfers.

265.    The Trustee is entitled to recover the Transfers or the value of the Transfers from Defendants for the benefit of the Estate pursuant to 11 U.S.C. §§ 544(b) and 550(a), and California Civil Code § 3439.07.

WHEREFORE, the Trustee prays for judgment as set forth below.

***Count IV:  Substantive Consolidation Against All Defendants***

266.    The Trustee hereby incorporates each of the foregoing paragraphs of the Complaint as though set forth fully herein.

267.    Each of the Owner Defendants, Affiliated Defendants and the Debtor has common ownership.

268.    Each of the Owner Defendants, Affiliated Defendants and the Debtor has common management.

269.    Salyer and the Owner Defendants managed and operated each of the Affiliated Defendants and, until Salyer was terminated by the Trustee, the Debtor.

41

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

270.    Debtor, Owner Defendants and Affiliated Defendants all operated as a single cohesive enterprise.

271.    Owner Defendants and Affiliated Defendants had little, if any, operations independent of their relationships to the Debtor.

272.    Many of the Owner Defendants and Affiliated Defendants were never capitalized or operated for profit, as described above.

273.    The Debtor, Owner Defendants and Affiliated Defendants did not negotiate with each other at arms-length.

274.    The corporate and financial integrity of the Owner Defendants, Affiliated Defendants, and the Debtor has never been respected.

275.    The funds, assets, books, records and financial affairs of each of the Owner Defendants, Affiliated Defendants and the Debtor have been inextricably commingled.

276.    With respect to **Blackstone**, in addition to the allegations set forth above, substantive consolidation with the Debtor's estate is appropriate because:

    a.    It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 27)

    b.    It has common management with Debtor and other Defendants (¶¶ 34, 36-37, 40-41)

    c.    Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and the Owner Defendants (¶¶ 34,40-42)

    d.    Together with Debtor and the other Defendants, it is operated as a single enterprise (¶¶ 43-44, 45, 48, 54-61, 62)

    e.    It has little if any operations independent of its relationship with Debtor (¶¶ 65, 72, 73)

    f.    It was never capitalized or operated for profit (¶¶ 74, 85-86)

    g.    It did not adhere to corporate formalities (¶¶87-88, 89, 93-94, 138)

    h.    It shares management and administration with Debtor and the other Defendants (¶¶ 95-96, 97, 98, 101, 104, 107-08, 110-13)

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

i. It shares facilities, records and resources with Debtor and the other Defendants (¶¶ 116, 117-21, 122, 124)

j. It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26, 129-30, 135-36)

k. There were inappropriate and insufficiently documented intercompany transfers of funds and other assets between it and Debtor and the other Defendants (¶¶ 137-40, 142, 143, 148, 150-52, 161-65).

277. With respect to **SS Farms**, in addition to the allegations set forth above, substantive consolidation with the Debtor's estate is appropriate because:

a. It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 29)

b. It has common management with Debtor and other Defendants (¶¶ 34, 36-37, 40-41)

c. Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and the Owner Defendants (¶¶ 34, 40-42)

d. Together with Debtor and the other Defendants, it is operated as a single enterprise (¶¶ 43-45, 48, 54-61, 62)

e. It has little if any operations independent of its relationship with Debtor (¶¶ 65, 68, 69, 73)

f. It was never capitalized or operated for profit (¶¶ 74, 81, 85-86)

g. It did not adhere to corporate formalities (¶¶ 87-88, 93-94, 138)

h. It shares management and administration with Debtor and the other Defendants (¶¶ 95-96, 97, 98, 100, 101, 103, 104, 106, 107-08, 110-13)

i. It shares facilities, records and resources with Debtor and the other Defendants (¶¶ 116, 117-21, 122)

j. It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26, 129-30, 133, 135-36)

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

k. There were inappropriate and insufficiently documented intercompany transfers of funds and other assets between it and Debtor and the other Defendants (¶¶ 84, 137-40, 142, 143, 147-48, 150-52, 153-54, 161-65).

278.    With respect to **SSC Farming**, in addition to the allegations set forth above, substantive consolidation with the Debtor's estate is appropriate because:

a. It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 29)

b. It has common management with Debtor and other Defendants (¶¶ 34, 36-37, 40-41)

c. Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and the Owner Defendants (¶¶ 34, 40-42)

d. Together with Debtor and the other Defendants, it is operated as a single enterprise (¶¶ 43-45, 46, 54-61, 62)

e. It has little if any operations independent of its relationship with Debtor (¶¶ 65, 67, 72, 73)

f. It was never capitalized or operated for profit (¶¶ 74, 82, 85-86)

g. It did not adhere to corporate formalities (¶¶ 87-88, 93-94, 138)

h. It shares management and administration with Debtor and the other Defendants (¶¶ 95-96, 97, 98, 99, 100, 101, 104, 106, 107-08, 110-13)

i. It shares facilities, records and resources with Debtor and the other Defendants (¶¶ 116, 117-21, 122)

j. It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26, 127-28, 129-30, 133, 135-36)

k. There were inappropriate and insufficiently documented intercompany transfers of funds and other assets between it and Debtor and the other Defendants (¶¶ 137-40, 142, 143, 144-45, 147-48, 150-52, 157-58, 161-65).

PHDATA 3265645_3

Adversary Complaint

279. With respect to **SSC I**, in addition to the allegations set forth above, substantive consolidation with the Debtor's estate is appropriate because:

   a. It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 30)

   b. It has common management with Debtor and other Defendants (¶¶ 34, 36-37, 40-41)

   c. Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and the Owner Defendants (¶¶ 34, 40-42)

   d. Together with Debtor and the other Defendants, it is operated as a single enterprise (¶¶ 43-45, 46, 54-61)

   e. It has little if any operations independent of its relationship with Debtor (¶¶ 65, 66, 73)

   f. It was never capitalized or operated for profit (¶¶ 74, 75-76, 82, 85-86)

   g. It did not adhere to corporate formalities (¶¶ 87-88, 93-94, 138)

   h. It shares management and administration with Debtor and the other Defendants (¶¶ 95-96, 98, 99, 100, 101, 106, 107-08, 110-13)

   i. It shares facilities, records and resources with Debtor and the other Defendants (¶¶ 114, 117-21, 122)

   j. It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26, 127-30-135-36)

   k. There were inappropriate and insufficiently documented intercompany transfers of funds and other assets between it and Debtor and the other Defendants (¶¶ 137-40, 142, 146, 150-52, 161-65).

280. With respect to **SSC II**, in addition to the allegations set forth above, substantive consolidation with the Debtor's estate is appropriate because:

   a. It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 30)

   b. It has common management with Debtor and other Defendants (¶¶ 34, 36-37, 40-41 )

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

c. Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and the Owner Defendants (¶¶ 34, 40-42)

d. Together with Debtor and the other Defendants, it is operated as a single enterprise (¶¶ 43-45, 47, 54-61)

e. It has little if any operations independent of its relationship with Debtor (¶¶ 65, 66, 73)

f. It was never capitalized or operated for profit (¶¶ 74, 75-76, 82, 85-86)

g. It did not adhere to corporate formalities (¶¶ 87-88, 93-94, 138)

h. It shares management and administration with Debtor and the other Defendants (¶¶ 95-96, 98, 99,100, 101, 106, 107-08, 110-13)

i. It shares facilities, records and resources with Debtor and the other Defendants (¶¶ 114, 117-21, 122)

j. It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26, 127-30, 135-36)

k. There were inappropriate and insufficiently documented intercompany transfers of funds and other assets between it and Debtor and the other Defendants (¶¶ 137-40, 142, 146, 150-52, 161-65).

281.    With respect to **SSC III**, in addition to the allegations set forth above, substantive consolidation with the Debtor's estate is appropriate because:

a. It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 31)

b. It has common management with Debtor and other Defendants (¶¶ 34, 36-37, 40-41)

c. Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and the Owner Defendants (¶¶ 34, 40-42 )

d. Together with Debtor and the other Defendants, it is operated as a single enterprise (¶¶ 43-45, 54-61)

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

e. It has little if any operations independent of its relationship with Debtor (¶¶ 65, 73)

f. It was never capitalized or operated for profit (¶¶ 74, 82, 85-86)

g. It did not adhere to corporate formalities (¶¶ 87-88, 93-94, 138)

h. It shares management and administration with Debtor and the other Defendants (¶¶ 95-96, 98, 101, 107-08, 110-13)

i. It shares facilities, records and resources with Debtor and the other Defendants (¶¶ 114, 117-21, 122)

j. It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26, 129-30, 135-36)

k. There were inappropriate and insufficiently documented intercompany transfers of funds and other assets between it and Debtor and the other Defendants (¶¶ 137-40, 142, 150-52, 161-65).

282. With respect to **Monterey**, in addition to the allegations set forth above, substantive consolidation with the Debtor's estate is appropriate because:

a. It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 31)

b. It has common management with Debtor and other Defendants (¶¶ 34, 36-38, 40-41)

c. Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and the Owner Defendants (¶¶ 34, 40-42 )

d. Together with Debtor and the other Defendants, it is operated as a single enterprise (¶¶ 43, 44, 50, 54-61)

e. It has little if any operations independent of its relationship with Debtor (¶¶ 65, 73, 82)

f. It was never capitalized or operated for profit (¶¶ 74, 82, 85-86)

g. It did not adhere to corporate formalities (¶¶ 87-88, 93-94, 138 )

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

   h.  It shares management and administration with Debtor and the other
       Defendants (¶¶ 95-96, 98, 101, 107-08, 110-13)

   i.  It shares facilities, records and resources with Debtor and the other
       Defendants (¶¶ 117-21)

   j.  It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26,
       129-30, 135-36, 206-08)

   k.  There were inappropriate and insufficiently documented intercompany
       transfers of funds and other assets between it and Debtor and the other
       Defendants (¶¶ 137-40, 142, 150-52, 161-65).

283.   With respect to **SMC**, in addition to the allegations set forth above, substantive consolidation with the Debtor's estate is appropriate because:

   a.  It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 32)

   b.  It has common management with Debtor and other Defendants (¶¶ 34, 36-38,
       40-41 )

   c.  Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and
       the Owner Defendants (¶¶ 34, 40-42)

   d.  Together with Debtor and the other Defendants, it is operated as a single
       enterprise (¶¶ 43-44, 49, 54-61)

   e.  It has little if any operations independent of its relationship with Debtor (¶¶
       65, 73, 84)

   f.  It was never capitalized or operated for profit (¶¶ 74, 84, 85-86)

   g.  It did not adhere to corporate formalities (¶¶ 87-88, 93-94, 138)

   h.  It shares management and administration with Debtor and the other
       Defendants (¶¶ 95-96, 98, 101, 107-08, 110-13)

   i.  It shares facilities, records and resources with Debtor and the other
       Defendants (¶¶ 114, 117-21)

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

1   j.  It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26,

2       129-30, 135-36)

3   k.  There were inappropriate and insufficiently documented intercompany

4       transfers of funds and other assets between it and Debtor and the other

5       Defendants (¶¶ 137-40, 141, 142, 150-52, 161-65).

6

7   284.    With respect to **SK Farms Services**, in addition to the allegations set forth above,

8   substantive consolidation with the Debtor's estate is appropriate because:

9   a.  It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 33)

10  b.  It has common management with Debtor and other Defendants (¶¶ 34, 36-38,

11      40-41)

12  c.  Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and

13      the Owner Defendants (¶¶ 34, 40-42)

14  d.  Together with Debtor and the other Defendants, it is operated as a single

15      enterprise (¶¶ 43, 44, 52, 54-61, 159)

16  e.  It has little if any operations independent of its relationship with Debtor (¶¶

17      65, 73)

18  f.  It was never capitalized or operated for profit (¶¶ 74, 85-86)

19  g.  It did not adhere to corporate formalities (¶¶ 87-88, 90, 93-94, 138 )

20  h.  It shares management and administration with Debtor and the other

21      Defendants (¶¶ 95-96, 98, 101, 105, 107-08, 110-13)

22  i.  It shares facilities, records and resources with Debtor and the other

23      Defendants (¶¶ 114, 117-21, 122)

24  j.  It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26,

25      129-30, 135-36)

26  k.  There were inappropriate and insufficiently documented intercompany

27      transfers of funds and other assets between it and Debtor and the other

28      Defendants (¶¶ 137-44, 141, 142, 150-52, 155-57, 159, 161-65).

PHDATA 3265645_3

Adversary Complaint

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

285. With respect to **SK Frozen Foods**, in addition to the allegations set forth above, substantive consolidation with the Debtor's estate is appropriate because:

    a. It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 32)

    b. It has common management with Debtor and other Defendants (¶¶ 34, 36-38, 40-41)

    c. Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and the Owner Defendants (¶¶ 34, 40-42)

    d. Together with Debtor and the other Defendants, it is operated as a single enterprise (¶¶ 43-44, 51, 54-61)

    e. It has little if any operations independent of its relationship with Debtor (¶¶ 65, 73, 78-79)

    f. It was never capitalized or operated for profit (¶¶ 74, 78-79, 85-86)

    g. It did not adhere to corporate formalities (¶¶ 87-89, 90, 93-94, 138)

    h. It shares management and administration with Debtor and the other Defendants (¶¶ 95-96, 98, 101, 107-08, 110-13)

    i. It shares facilities, records and resources with Debtor and the other Defendants (¶¶ 114, 117-21, 122)

    j. It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26, 129-30, 135-36)

    k. There were inappropriate and insufficiently documented intercompany transfers of funds and other assets between it and Debtor and the other Defendants (¶¶ 137-40, 141, 142, 150-52, 161-65).

286. With respect to the Owner Defendants, in addition to the allegations set forth above, and in addition to exercising control over the Debtor and the Affiliated Defendants for their own benefit, and to the detriment of Debtor, substantive consolidation with the Debtor's estate is appropriate because:

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

a.  They own Debtor and all the Affiliated Defendants (¶¶ 24-28, 35)

b.  They manage Debtor and the Affiliated Defendants (¶¶ 34, 35, 36, 37, 39-42 )

c.  Salyer controls them, and they control Debtor and the Affiliated Defendants (¶¶ 34, 40-42)

d.  Together with Debtor and the Affiliated Defendants, they operate a single enterprise (¶¶ 43-44, 46, 54-61, 62)

e.  They have little if any operations independent of their relationship with Debtor and the Affiliated Defendants (¶¶ 65, 73, 83)

f.  They were never capitalized or operated for profit (¶¶ 74, 85-86)

g.  They did not adhere to corporate formalities (¶¶ 87-88, 93-94, 138)

h.  They share management and administration with Debtor and the Affiliated Defendants (¶¶ 95-96, 98, 101, 103. 104, 107-08, 110-13)

i.  They share facilities, records and resources with Debtor and the Affiliated Defendants (¶¶ 115, 117-21, 122, 124)

j.  They did not deal with Debtor and the Affiliated Defendants at arms-length, and did not permit Debtor and the Affiliated Defendants to deal with each other at arms-length (¶¶ 125-26, 129-30, 135-36)

k.  There were inappropriate and insufficiently documented intercompany transfers of funds and other assets between them and Debtor, other Owner Defendants and the Affiliated Defendants (¶¶ 137-40, 142, 143, 149, 150-52, 161-65).

287.    The Debtor, through the Owner Defendants, exercised complete dominion and control over the Affiliated Defendants, commingled the Debtor's assets with the assets of the Defendants, transferred property from the Debtor to the Defendants, from the Defendants to the Debtor, and among the Defendants, and otherwise treated the Defendants' property as if it were the Debtor's, such that there is a substantial identity between and among the Debtor and the Defendants and the Defendants are mere instrumentalities of the Debtor.

PHDATA 3265645_3

288.     Because of the intermingling of the assets, liabilities and finances of the Debtor, the Owner Defendants, and the Affiliated Defendants, an accurate identification and allocation of assets is not realistically possible absent an expenditure of time and expense that would threaten the realization of any net assets for all the creditors of the Debtor, Owner Defendants, and Affiliated Defendants.

289.     The Debtor's use, dominion and control over the Affiliated Defendants was improper, inequitable, and contrary to the law and public policy of the State of California.

290.     Substantive consolidation should be granted *nunc pro tunc*, as of the date of the filing of the Petitions on May 5, 2009.

Wherefore, the Trustee prays for judgment as set forth below.

### Count V: Declarative Relief Against All Defendants That The Defendants Are the Alter Egos of the Debtor Under Applicable State Law

291.     The Trustee hereby incorporates each of the foregoing paragraphs of the Complaint as though set forth fully herein.

292.     The Trustee is informed and believes and thereon alleges that the Debtor exercised complete dominion and control over the Defendants, disregarded the separate ownership of the Defendants, and used the assets of the Defendants as if they were those of the Debtor, and *vice versa*.

293.     The Defendants in truth and in fact are a device, mere artifice, and veil used to conceal the Debtor's true interest in and dominion and control over the Defendants and their assets.

294.     The Debtor and the Defendants failed to maintain adequate corporate records for themselves and for the Defendants and confused the records of the Defendants.  In particular, the Debtor and Defendants failed to maintain adequate corporate records concerning intercompany transfers, prepaid expenses, asset purchases and transfers, and purported assignments of rights.

295.     As to SK Foods, there are minimal minutes and resolutions, and they pertain primarily to changes in officers and managers of the partnership.  SK Foods failed to follow corporate or partnership formalities and properly document the transfer of millions of dollars.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

296.     The Debtor and the Defendants occupied the same offices and business locations and employed and utilized the same management team and employees.

297.     The Debtor used the Defendants as a mere shell, instrumentality and conduit for a single business venture.

298.     The Debtor and the Defendants have a unity of interest and ownership such that there is no separateness to their existence, and recognition of the separate existence of the Debtor and the Defendants from the Debtor would result in a fraud, an inequitable result, or injustice to the Debtor's creditors.

Wherefore, the Trustee prays for a judgment as set forth below.

### Count VI: Recovery of Fraudulent Conveyances Against The Owner Defendants

299.     The Trustee hereby incorporates each of the preceding paragraphs of the Complaint as though set forth fully herein.

300.     The Trustee is informed and believes and thereon alleges that the Debtor provided all or substantially all of the funds for the initial capitalization of the Affiliated Defendants and acquisition of the Foreign Entities.

301.     The Trustee is informed and believes and thereon alleges that the Owner Defendants claim ownership (the "Equity Interests") of the Affiliated Defendants and the Foreign Entities.

302.     The Debtor transferred the Equity Interests in the Affiliated Defendants and Foreign Entities to the Owner Defendants with actual intent to hinder, delay or defraud creditors of the Debtor.

303.     The Debtor received less than reasonably equivalent value from the Owner Defendants in exchange for the transfer of the Equity Interests and (i) was insolvent on the date the transfers was made or became insolvent as a result of the transfer; or (ii) was engaged in business or was about to engage in business for which its remaining property was unreasonably small, or (iii) intended to incur, or believed the Debtor would incur debts that would be beyond its ability to pay.

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

304.     The Trustee is entitled to recover the Equity Interests in the Affiliated Defendants and Foreign Entities or the value thereof for the benefit of the estate pursuant to 11 U.S.C. §§ 548(a) and 550(a).

Wherefore, the Trustee prays for a judgment as set forth below.

### *Count VII: Turnover Of Property Pursuant To 11 U.S.C. §§ 521(A)(4) And 542(A)*

305.     The Trustee hereby incorporates each of the preceding paragraphs of the Complaint as though set forth fully herein.

306.     The Ownership Defendants and Affiliated Defendants and all their assets are property of the Debtor's bankruptcy estate within the meaning of 11 U.S.C. §541(a).  The Owner Defendants are required to turn over to the Trustee all the Affiliated Defendants and Foreign Entities and their assets pursuant to 11 U.S.C. §§521(a)(4) and 542(a).

Wherefore, the Trustee prays for a judgment as set forth below.

### *Prayer For Relief*

WHEREFORE, the Trustee prays for judgment as follows:

1.     On the First Claim for Relief, for judgment avoiding and preserving for the benefit of the Estate the Transfers dated May 5, 2008 to the present and for judgment against Defendants in an amount equal to the value of those Transfers together with prejudgment and post-judgment interest thereon at the legal rate allowed under 28 U.S.C. §1961 from the date of the Transfers.

2.     On the Second Claim for Relief, for judgment avoiding and preserving for the benefit of the Estate the Transfers and for judgment against Defendants in an amount equal to the value of the Transfers together with prejudgment and post-judgment interest thereon at the legal rate allowed under 28 U.S.C. §1961 from the date of the Transfers.

3.     On the Third Claim for Relief, for judgment avoiding and preserving for the benefit of the Estate the Transfers and for judgment against Defendants in an amount equal to the value of the Transfers together with prejudgment and post-judgment interest thereon at the legal rate allowed under 28 U.S.C. §1961 from the date of the Transfers

54

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

4.     On the Fourth Claim for Relief, for judgment substantively consolidating the Debtor's estate, the Owner Defendants, and the Affiliated Defendants *nunc pro tunc* as of May 5, 2009, and

(a)     determining that all of the Owner Defendants, the Affiliated Defendants and their assets constitute property of the consolidated bankruptcy estate;

(b)     quieting title to all Owner Defendants' and Affiliated Defendants' assets in favor of the Trustee;

(c)     determining that any transfers of property by the Owner Defendants and Affiliated Defendants constitute transfers of property of the Debtor's bankruptcy estate for purposes of any action under Part V of Title 11 of the United States Code, or any provision of non-bankruptcy law authorizing the recovery of transferred property;

(d)     determining that the Trustee has sole authority to liquidate any Owner Defendant, Affiliated Defendant and its assets for the benefit of the consolidated bankruptcy estate; and

(e)     determining that the Trustee has sole authority to recover any property transferred by the Owner Defendants and Affiliated Defendants for the benefit of the consolidated bankruptcy estate.

5.     On the Fifth Claim for Relief, for judgment determining that the Debtor and Defendants are alter egos of each other, and that the existence of the Defendants separate and apart from that of the Debtor should be disregarded.

6.     On the Sixth Claim for Relief, for judgment avoiding and preserving for the benefit of the Debtor's estate the Equity Interests in the Affiliated Defendants and Foreign Entities, or the value thereof.

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

7.    On the Seventh Claim for Relief, for judgment compelling the Owner Defendants to turn over all Equity Interests in the Affiliated Defendants and Foreign Entities to the Trustee.

8.    For costs of suit incurred herein; and

9.    For such other and further relief the Court deems just and proper.

Dated: January 11, 2010          SCHNADER HARRISON SEGAL & LEWIS LLP


/s/ Gregory C. Nuti
    Gregory C. Nuti
    Attorneys for Plaintiff Bradley D. Sharp,
    Chapter 11 Trustee

56

PHDATA 3265645_3

Adversary Complaint

# EXHIBIT A

| DEFENDANT NAME | Debit transactions | | Credit transactions | | Net amount |
|---|---|---|---|---|---|
| | Amount | Count | Amount | Count | |
| BLACKSTONE RANCH CORPORATION | $ 1,199,209 | 47 | $ (7,717,509) | 99 | $ (6,518,300) |
| MONTEREY PENNINSULA FARMS, LLC | No direct transactions | | | | |
| SALYER MANAGEMENT COMPANY, LLC | $ - | 0 | $ (269,221) | 3 | $ (269,221) |
| SCOTT SALYER REVOCABLE TRUST | $ 4,813,242 | 5 | $ (17,691,102) | 66 | $ (12,877,861) |
| SCOTT SALYER AS TRUSTEE FOR THE SCOTT SALYER REVOCABLE TRUST | | | No direct transactions | | |
| SK FARMS SERVICES, LLC | $ - | 0 | $ (6,000,000) | 1 | $ (6,000,000) |
| SK FOODS LLC | $ 28,158,608 | 25 | $ (28,245,863) | 57 | $ (87,255) |
| SK FOODS CANNING, LLC | | | No direct transactions | | |
| SK FROZEN FOODS | $ 51,628 | 1 | $ (1,150,213) | 10 | $ (1,098,585) |
| SKPM CORP. | $ 6,884,254 | 16 | $ (19,138,094) | 167 | $ (12,253,840) |
| SS FARMS, LLC | $ 158,221,966 | 193 | $ (336,370,852) | 712 | $ (178,148,885) |
| SSC FARMING, LLC | $ 18,933,735 | 36 | $ (13,692,674) | 70 | $ 5,241,061 |
| SSC FARMING I, LLC / SSC Farms I | $ 210,000 | 1 | $ (982,652) | 11 | $ (772,652) |
| SSC FARMING II, LLC / SSC Farms II | $ 280,000 | 1 | $ (2,981,591) | 17 | $ (2,701,591) |
| SSC FARMING III, LLC / SSC FARMS III | $ - | 0 | $ (319,115) | 2 | $ (319,115) |
| **GRAND TOTALS** | **$ 218,752,642** | **325** | **$ (434,558,887)** | **1,215** | **$ (215,806,244)** |

Note:
Above represents general ledger transactions recorded by SK Foods relating to related parties and not necessarily reflective of cash activity.