**48 PAGES**

Gregory C. Nuti (CSBN 151754)
  gnuti@schnader.com
Kevin W. Coleman (CSBN 168538)
  kcoleman@schnader.com
Michael M. Carlson (CSBN 88048)
  mcarlson@schnader.com
Todd Holvick (CSBN 257784)
  tholvick@schnader.com
SCHNADER HARRISON SEGAL & LEWIS LLP
One Montgomery Street, Suite 2200
San Francisco, California  94104-5501
Telephone: 415-364-6700
Facsimile: 415-364-6785

Attorneys for Plaintiff
Bradley D. Sharp, Chapter 11 Trustee

FILED

OCT - 2 2013

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re<br><br>SK Foods, LP, a California Limited Partnership, et al.<br><br>Debtors.<br><br>BRADLEY D. SHARP, Chapter 11 Trustee,<br><br>Plaintiff,<br><br>vs.<br><br>SCOTT SALYER, as trustee of the Scott Salyer Revocable Trust, et al.,<br><br>Defendants. | Case No.: 09-29162-D-11<br><br>Chapter 11<br><br>**DC No. SH-16**[1]<br><br>Adversary Proceeding No. 10-02014<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW RE MOTION FOR DEFAULT JUDGMENT, OR ALTERNATIVELY, SUMMARY JUDGMENT**<br><br>Date:  October 2, 2013<br>Time:  10:00 a.m.<br>Place:  Courtroom 34<br>            501 I Street, 6th Floor<br>            Sacramento, CA  95814<br>Judge: Hon. Robert S. Bardwil |

---

[1] The Trustee's papers originally used DCN SH-17, but the Court has used DCN SH-16 in its docketing system.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

**FINDINGS OF FACT AND CONCLUSION OF LAW RE MOTION FOR DEFAULT JUDGMENT, OR ALTERNATIVELY, SUMMARY JUDGMENT**

On the 2nd day of October 2013, the Court considered the motion of Bradley D. Sharp (the "Trustee"), the duly appointed and acting Chapter 11 trustee for SK Foods, L.P., a California limited partnership ("SK Foods"), and RHM Industrial/Specialty Foods, Inc., a California corporation, d/b/a Colusa County Canning Co. ("RHM") for default judgment, or alternatively, summary judgment on the Trustee's fourth claim for relief (Substantive Consolidation) set forth in his Complaint filed January 11, 2010 (the "Motion"). The Court considered the submissions and declarations in support of the Motion, and all declarations, evidence and memoranda previously filed in this action, the underlying Chapter 11 case, and related adversary proceedings that are referenced therein, and the oppositions and submissions of the Defendants and other parties in interest in response to the Motion. After affording the parties the foregoing hearing, and good cause having been shown, the Court granted the Trustee's motion and entered an order granting judgment on the Trustee's fourth claim for relief, which is entered contemporaneously herewith. The Court makes the following findings of fact and conclusion of law in connection with its decision to enter an order granting the motion seeking default judgment, or alternatively, summary judgment on the Trustee's fourth claim for relief, substantive consolidation as to the following defendants in this action:  SK PM Corp. ("SKPM"), SK Foods, LLC ("SKF"), SKF Canning, LLC ("SKF Canning"), Blackstone Ranch Corporation ("Blackstone"), Monterey Peninsula Farming, LLC ("Monterey"), Salyer Management Company, LLC ("SMC"), SK Farms Services, LLC ("SK Farms Services"), SS Farms, LLC ("SS Farms"), SSC Farming, LLC ("SSC"), SSC Farms I, LLC ("SSC I"), SSC Farms II, LLC ("SSC II"),  and SSC Farms III, LLC ("SSC III") (collectively, "Defendants").  Scott Salyer ("Salyer") as the Trustee of the Scott Salyer Revocable Trust (the "SSR Trust") and SK Frozen Foods, LLC ("SK Frozen Foods") are also defendants in this action, but the Trustee is not seeking substantive consolidation as to them and they are not included within the defined term "Defendants" hereinafter.

//

//

**FINDINGS OF FACT**

A.    **Facts Regarding the Procedural History of this Proceeding**

1.    The Trustee is the duly appointed and acting Chapter 11 trustee for SK Foods and RHM (collectively, the "Debtors").

2.    On May 5, 2009 (the "Petition Date"), involuntary bankruptcy petitions were filed against SK Foods and RHM. Thereafter, on May 7, 2009, the Debtors filed a voluntary petition for relief (the "Bankruptcy Case") under chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, et. seq. (the "Bankruptcy Code"). The Plaintiff was appointed the Chapter 11 trustee in the Bankruptcy Case and presently serves in that capacity.

3.    On January 11, 2010, the Trustee initiated his complaint (the "Complaint") against Defendants and against Salyer, as trustee of the SSR Trust and SK Frozen Foods, seeking, among other relief, substantive consolidation of the defendants in this action with the Debtors' estate (Docket Number ("DN") 1).

4.    On March 9, 2010, the Trustee moved for entry of a temporary restraining order and order to show cause re: preliminary injunction (DN 11). On March 11, 2010, the Court entered a Temporary Restraining Order, restraining and enjoining the Defendants from selling, assigning, transferring, or otherwise dissipating assets or moving the assets outside of California, except upon application to this Court and for good cause shown (DN 24). On March 20, 2010, the Court entered a preliminary injunction against Defendants (DN 50) (the "March 20, 2010 Preliminary Injunction"). The injunction constituted the continuation, without interruption, of the restraints and injunction imposed upon the Defendants by the Court's Temporary Restraining Order, until such time as modified by the Court. Id. at 3:17-19. At the time the Court granted the March 20, 2010 Preliminary Injunction, the Court made Finding of Fact and Conclusions of Law that the Trustee was likely to succeed on the merits of his claim that the Defendants assets should be included in the Debtors' Estate and that a preliminary injunction was required to preserve the value of the those assets pending trial (DN 63). The March 20, 2010 Preliminary Injunction was modified six times, on October 13, 2010, January 20, 2011, February 16, 2011,

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHDATA 4713258_3

May 1, 2011, May 10, 2011, and September 2, 2011 (collectively the "Preliminary Injunction Orders").

      5.       On March 24, 2010, the Defendants filed their answer (the "Answer") to the Complaint (DN 55).

      6.       On June 28, 2011, the Court entered an order staying this adversary proceeding until further Court order due to the pending criminal proceedings against Salyer and its potential impact on the Defendants' ability to mount a defense (DN 233).

      7.       Having found that some of the Defendants and their agents had violated the Preliminary Injunction Orders, *see* Civil Minutes, filed November 30, 2011 (DN 346), the Court, on December 1, 2011, modified the Preliminary Injunction Orders and entered an order appointing a receiver over some of Defendants' assets. *See* Order Modifying Preliminary Injunction and Appointing Receiver (the "December 1, 2011 Receivership Order").[2] The December 1, 2011 Receivership Order was modified three times, on December 27, 2011 (DN 372), January 18, 2012 (DN 389), and May 10, 2012 (DN 559) (the "Receivership Orders"). The modifications to the Receivership Orders gave the receiver power over substantially all of Defendants' assets.

      8.       On June 24, 2012, the Court entered an order vacating the June 28, 2011 stay in this adversary proceeding (DN 586).

      9.       On August 23, 2012, the Court entered a scheduling order authorizing the parties to seek discovery from any source and setting a fact discovery cutoff of April 30, 2013 (DN 597).

      10.     On November 16, 2012, the Trustee served initial discovery requests, including, Plaintiff's Interrogatories to Defendants, Set No. One and Plaintiff's Request for Production of Documents to Defendants, Set No. One (the "Discovery Requests"), on Attorney Holly Hostrop,

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

---

[2] The caption of the December 1, 2011 Receivership Order shows that it was entered in three adversary proceedings, AP 09-2692, AP 10-2014 [this action] and AP 10-2016. However, a copy of that order is not entered in the Pacer Docket of this Proceeding. A correct copy of the order signed by the Court is attached to the December 27, 2011 Receivership Order (DN 372).

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHDATA 4713258_3

Defendants' counsel at the time. February 13, 2013 Declaration of Gregory C. Nuti in Support of Motion to Strike Pleadings, For Entry of Default, and For Leave to Seek Entry of Default Judgment (DN 633 in No. 10-2014) ("February 13, 2012 Nuti Decl."), ¶ 4, Exhibit A.

11.     The deadline for the Defendants to respond to the Discovery Requests passed; however, the Defendants failed to respond or otherwise object to the Discovery Requests. February 13, 2013 Nuti Dec., ¶ 5.

12.     On January 2, 2013, Ms. Hostrop filed a motion to withdraw as counsel of record for the Defendants (DN 619). On January 17, 2013, the Court granted Ms. Hostrop's motion to withdraw as counsel for the Defendants (DN 629).

13.     On February 13, 2013, the Trustee filed a Motion to Strike Pleadings, For Entry of Default, and Leave to Seek Entry of Default Judgment against the Defendants ("Motion for Entry of Default") (DN 631).

14.     The Defendants were served with written notice of the Trustee's Motion for Entry of Default. DN 635.

15.     Defendants did not file any opposition to the Motion for Entry of Default.

16.     On March 14, 2013, the Court entered its Order Granting the Trustee's Motion to Strike Pleadings, For Entry of Default, and Leave to Seek Entry of Default Judgment (DN 642). The Order struck Defendants' Answer and entered a default. The Court set forth its reasons for granting the Trustee's Motion for Entry of Default in its Civil Minutes, dated March 13, 2013 (DN 644), which are incorporated herein by this reference. In sum, the Court found (1) "that the defendants are entities that are not permitted to participate in this adversary proceeding without an attorney. LBR 1001-1(c), incorporating Local District Court Rule 183(a) . . . *see* D–Beam, Ltd. P'ship v. Roller Derby Skates, Inc., 366 F.3d 972, 973-74 (9th Cir. 2004) (citation omitted) ("It is a longstanding rule that corporations and other unincorporated associations must appear in court through an attorney.")," (2) that "[t]he defendants have . . . been unrepresented by counsel for seven weeks, a state of affairs that renders them unable to take steps to put on a defense," and (3) "[c]ase law makes clear that entry of default is an appropriate remedy for an entity defendant's failure to be represented by counsel, where local rules so require." *See*

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                    PHDATA 4713258_3

1  Employee Painters' Trust v. Ethan Enters., 480 F.3d 993, 998 (9th Cir. 2007); United States v.

2  High Country Broadcasting Co., 3 F.3d 1244, 1245 (9th Cir. 1993)." Id.

3      17.    On April 10, 2013, the Trustee filled his motion for entry of default judgment, or

4  alternatively, summary judgment (the "Motion") on his fourth claim for relief (Substantive

5  Consolidation) set forth in his Complaint (DN 647) and set a hearing date of May 8, 2013

6      18.    Following several unsuccessful attempts by Kimberly A. Wright, an attorney

7  purporting to represent Defendants (*see* Order dated April 17, 2013 (DN 666) and Order dated

8  April 22, 2013 (DN 672), to appear as counsel of record for Defendants, on April 29, 2013, the

9  Court issued an order continuing the hearing on the Motion from May 8, 2013 to May 22, 2013

10  at 10:00 a.m. to allow Ms. Wright a final opportunity to enter a proper appearance and for

11  Defendants to respond to the Motion.  The order also set a new deadline of May 8, 2013 for

12  Defendants to file an opposition, if any, to the Motion (DN 673).

13      19.    On May 8, 2013, Ms. Wright filed an amended application seeking to appear as

14  attorney of record for the Defendants in this adversary proceeding (DN 677).  On May 10, 2013,

15  the Court entered its order granting Ms. Wright's application to appear as counsel of record for

16  the Defendants (DN 680).

17      20.    On May 13, 2013, Defendants, through Ms. Wright, filed an Opposition to the

18  Motion (DN 681).  The Opposition was untimely, having failed to have been served by May 8,

19  the deadline set in the Court's Order dated April 29, 2013 (DN 673).

20      21.    The Court finds that given the multiple opportunities given by the Court to

21  Defendants to file an opposition to the Motion, the Court would be justified in refusing to

22  consider the late-filed Opposition of May 13, 2013, and to grant Trustee's motion as unopposed.

23  However, the Court has reviewed Defendants' Opposition, and the Court finds that neither the

24  opposition nor any of the supporting documents presented any evidence that created a triable

25  issue of material fact.

26      22.    Additionally, although the Opposition was filed, Defendants did not and never

27  have filed a motion to set aside the default entered March 14, 2013.

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

-5-

23.    In their opposition to the Motion, Defendants also sought, pursuant to Rule 56(d) of the Federal Rule of Civil Procedure ("Rule 56(d)"), additional time for discovery to respond to the portion of the Motion seeking the alternative relief of summary judgment.

24.    The Court finds that Defendants failed to meet their burden under Rule 56(d). Specifically, Defendants failed to explain why they had not taken necessary discovery during the time preceding the filing of the Motion.  Defendants could have conducted discovery and prepared their defense in the 14-month period between the time defendants responded to the Trustee's complaint in late March 2010 (*see* DN 55) and the issuance of a stay in this action (entered at Defendants' request) in June 2011 (DN 233) and also during the 11-month period between when the stay was lifted in June 2012 (DN 586) and the April 30, 2013 discovery cut-off (*see* DN 597).  Additionally, Defendants failed to identify any specific facts that would be uncovered by further discovery or to explain why those facts would preclude summary judgment.  Finally, Defendants failed to identify any specific discovery it wished to undertake; Defendants neither identified witnesses they wished to depose nor documents they wished to obtain.

25.    On May, 22, 2013, the Court held an initial hearing on the Trustee's Motion, which the Court treated as a status conference (*see* DN 681).  At its conclusion, the Court continued the hearing on the Motion to June 19, 2013, and set a deadline of June 12, 2013 for supplemental briefing from the Trustee addressing certain concerns raised by the Court at the hearing and for the submission of additional evidence in support of substantive consolidation. The Court further requested that the Trustee undertake due diligence to identify potential creditors of the Defendants and to prepare a Proposed Form of Notice and Opportunity to Object to be served upon all potential creditors of the Defendants.

26.    Following the May 22 hearing, the Trustee attempted to identify potential creditors of the Defendants for the purpose of giving them notice of the Motion.  The Trustee performed the following due diligence in connection therewith:

a)    Undertook a review of the information and documents within the Debtors' books and records, including electronic and hard copy documents, as well as the Debtors' DAX and AAS computer systems.  The Trustee was able to identify

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHDATA 4713258_3

approximately 1,212 vendors of the Defendants ("Vendor List"). June 12, 2013 Supplemental Declaration of Shondale Seymour In Support of Default Judgment Or, Alternatively, Summary Judgment (DN 704 in No. 10-2014) ("June 12, 2013 Seymour Decl."), ¶ 9, Exhibit B.

b) Cross-referenced the Vendor List with the claims filed against the Debtors' estate. The Trustee determined that approximately 30% of the entities on the Vendor List have filed claims. June 12, 2013 Supplemental Declaration Of Bradley D. Sharp In Support Of Motion For Entry Of Default Judgment, Or Alternatively, Motion For Summary Judgment (DN 701 in No. 10-2014) ("June 12, 2013 Sharp Decl."), ¶ 7, Exhibit A.

c) Obtained a report from Robert Greeley, the Receiver appointed to oversee the Defendants' assets (the "Receiver") as to the known business operations, assets and liabilities of each of the Defendants. June 12, 2013 Declaration Of Robert C. Greeley Re Status Of Assets Subject To Receivership Order Submitted In Connection With Trustee's Motion For Default Judgment And, In The Alternative, Summary Judgment (DN 705 in No. 10-2014) ("June 12, 2013 Greeley Decl."), ¶¶ 2-10.

d) Investigated the business purpose of each Defendant and the status of any intended business operations. June 12, 2013 Seymour Decl., ¶¶ 10-35.

e) Conducted a search of public databases for Uniform Commercial Code filings and pending litigation involving the Defendants. June 12, 2013 Supplemental Declaration Of Todd Holvick In Support Of Motion For Entry Of Default Judgment Or, Alternatively, Summary Judgment (DN 703 in No. 10-2014) ("June 12, 2013 Holvick Decl."), ¶¶ 4-5.

f) Re-served the Defendants with his prior discovery seeking information regarding the Defendants' assets, liabilities and the identity of their creditors. Defendants did not provide any responses to the Trustee's discovery requests. June 12, 2013 Declaration of Gregory C. Nuti In Support of Supplemental Brief In Support Of Motion For Default Judgment And, In The Alternative, Summary Judgment (DN 702 in No. 10-2014) ("June 12, 2013 Nuti Decl."), ¶ 3.

27. The Trustee then aggregated the information obtained through the due diligence described above and created a supplemental service list ("SubCon Defendants Creditors List") containing approximately 1216 potential creditors of the Defendants. June 12, 2013 Sharp Decl., ¶ 7, Exhibit A.

28. On June 19, 2013, the Court held a continued hearing at which the Court instructed the Trustee to file a revised form of proposed notice ("Revised Notice") to be served on the those potential creditors contained in the SubCon Defendants Creditors List in connection

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHDATA 4713258_3

with a further continued hearing on the Motion (DN 712). The Trustee submitted his Revised Notice on June 21, 2013 (DN 709). On the same day, the Court entered an order approving the Revised Notice and setting a deadline for service of the Revised Notice as well as other deadlines associated with a further continued hearing on August 21, 2013 (DN 711).

29.    The Trustee served the Revised Notice on the potential creditors contained in the SubCon Defendants Creditors List on July 3, 2013 (Doc. Nos. 713 & 714).

30.    Based on the foregoing, the Court finds that the Trustee has made a reasonable and good faith effort to identify all of the creditors of Defendants and provide them with notice of the Trustee's Motion, and that creditors of Defendants have been accorded a reasonable opportunity to be heard in opposition to the Motion.

31.    Thereafter, two creditors filed objections to the Trustee's Motion, Wells Fargo Bank, N.A. ("Wells Fargo") and Lynne H. Salyer ("Ms. Salyer"), the ex-wife of Scott Salyer (DN 715 & 739, respectively). As described further below, the Trustee has settled with these objectors, and they no longer object to substantive consolidation.

32.    On August 21, 2013, the Court held a continued hearing on the Motion. At the request of the parties, the Court continued the hearing to September 5, 2013.

33.    The September 5, 2013 hearing on the Motion was subsequently continued to September 12, 2013, so that the Trustee could continue settlement discussion with both Wells Fargo and Ms. Salyer.

34.    At the hearing on September 12, 2013, the Trustee reported that he had reached a settlement with Wells Fargo and Ms. Salyer. The Official Committee of Unsecured Creditors ("Creditors' Committee") and Bank of Montreal, agent for the Debtors' pre-petition secured lenders ("BMO") both appeared at the September 12 hearing and supported the Trustee's proposed settlement with Wells Fargo and Ms. Salyer. The parties requested that the Court enter an order shortening time for the Trustee to file a motion for approval of these settlements and that the hearing on the Motion be continued until October 2, 2013 so that it could be heard at the same time as the motion to approve these settlements. Counsel for Defendants also appeared at

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                    PHDATA 4713258_3

the September 12 hearing but did not object to the request to shorten time.  The Court continued the hearing on the motion to October 2, 2013, as requested by the parties (DN 751).

35.  On September 16, 2013, the Court entered an Order shortening time for the Trustee to file a motion for approval of the settlement reached with Wells Fargo and Ms. Salyer (DN 4460 in Case No. 09-29162).

36.  On September 16, 2013, the Trustee filed his Motion to Approve Compromises of Controversy Pursuant to Rule of Bankruptcy 9019 with (1) Wells Fargo Bank, N.A., and (2) Lynn Salyer (DN 4461 in Case No. 09-29162).

37.  On September 27, 2013, the Trustee filed a notice that he was not seeking substantive consolidation as against Scott Salyer, as Trustee of the Scott Salyer Revocable Trust and SK Frozen Foods, LLC.

**B.**    **Facts Regarding the Trustee's Motion for Default Judgment**

38.  On March 14, 2013, the Court entered its Order Granting the Trustee's Motion to Strike Pleadings, For Entry of Default, and Leave to Seek Entry of Default Judgment (DN 642), which entered a default against Defendants, pursuant to Federal Rule of Civil Procedure 55(a), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7055.

39.  Defendants have not moved to set aside the default entered March 14, 2013.

40.  The Defendants were served with written notice of the Trustee's application for entry of default judgment at least seven days before the hearing on that application.  DN 655.

41.  Defendants' Opposition does not request that the default be set aside, nor does it set forth any facts showing that good cause exists for setting aside the default, as required by Rule 55(c).  *See* DN 673.

42.  The default remains in effect.

**C.**    **Facts Regarding the Trustee's Motion for Summary Judgment**

43.  The Trustee has presented evidence, as set forth below, supporting the following facts.  The Defendants have not presented any evidence establishing that any of these facts are disputed.  Defendants have not objected to any of the evidence presented by the Trustee.  Certain objections to the Trustee's evidence were asserted by Wells Fargo Bank (DN 17).  The Court

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHDATA 4713258_3

1 deems those objections as withdrawn as a result of the settlement between the Trustee and Wells

2 Fargo Bank and the Wells Fargo Banks' withdrawal of its opposition to the Motion.  The Court

3 finds that the following facts are undisputed.

4        *1.*     *Facts Common to All Defendants*

5     As to each of the Defendants, the Court finds the following facts undisputed:

6        a)    *Common Ownership and Control*

7     44.    The Debtors and each of the Defendants were indirectly owned and ultimately

8 controlled by Salyer and his two daughters.  August 19, 2009 Declaration of Shondale Seymour

9 (DN 613 in No. 09-29162) ("August 19, 2009 Seymour Decl."), ¶ 7, Exhibit 2; March 9, 2010

10 Declaration of Shondale Seymour Declaration (DN 14 in No. 10-2014) ("March 9, 2010

11 Seymour Decl."), ¶¶ 4-6, Exhibit 1; May 8, 2009 Declaration of Lisa Crist (DN 33 in No. 09-

12 29162) ("May 8, 2009 Declaration of Lisa Crist"), ¶ 18.

13        b)    *Single Enterprise*

14     45.    Together, the Debtors and Defendants operated as a single enterprise growing,

15 harvesting, processing and readying for shipment tomatoes and other crops.

16     46.    The Debtors and Defendants were collectively identified to the public as "Salyer

17 Enterprises" or "SK Foods Group".  August 19, 2009 Declaration of Dan Kline (DN 612 in

18 No. 09-29162) ("August 19, 2009 Kline Decl."), ¶ 5; September 15, 2009 Declaration of Donald

19 Putterman (DN 727 in No. 09-29162) ("September 15, 2009 Putterman Decl."), ¶ 3. The

20 Debtors' website www.skfoods.com identified the Debtors as both growers and processors of

21 tomatoes. April 10, 2013 Declaration of Greg Nuti (DN 652 in No. 10-2014 ("April 10, 2013

22 Nuti Decl."), ¶ 5, Exhibit B.

23     47.    SSC, SSC I, SSC II, and SSC III grew the tomatoes and held title to the land upon

24 which the tomatoes were grown.  SS Farms would harvest the tomatoes and provided farming

25 services to SSC, SSC I, SSC II, and SSC III.  SSC then would provide the vegetables to SK

26 Foods or RHM for processing.  March 9, 2010 Seymour Decl., ¶ 7.

27     48.    As part of the processing, SK Foods/RHM would discharge wastewater on the

28 land owned by SSC, SSC I and SSC II.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW           PHDATA 4713258_3

49.    To process the tomatoes, SK Foods used 10,000 wood bins, which are owned by Defendant SSR Trust.  It also used a computer system that was owned and/or leased by Salyer American Fresh Foods ("SAFF"), another Salyer-controlled entity.  SK Foods also used fiber drums that were supplied by another Salyer-entity, CSSS, L.P. ("CSSS"), and engaged CSSS to load the tomatoes onto a rail line for shipment.  March 9, 2010 Seymour Decl., ¶¶ 7-8.

50.    Each of Defendants, at least in theory, had a distinct role in this process, but from a financial perspective, each Defendant was entirely dependent upon the Debtors and the other Defendants for its survival.  March 9, 2010 Seymour Decl., ¶¶ 9-22; September 15, 2009 Declaration of Donald J. Putterman in Support of Opposition to Motion to Disqualify Kasowitz (DN 782 in No. 09-29162) ("September 15, 2009 Putterman Decl."), ¶ 7.

51.    The number of related entities and their relationships have caused confusion as to on whose behalf certain acts have been taken.  Salyer was himself confused about which entity owned various assets.  The structure of the various entities has caused even sophisticated legal counsel to be confused as to who was being represented by whom.  October 16, 2009 Memorandum Decision, p. 2, n.2 (Doc No. 865 in No. 09-29162) [Filed Under Seal]; April 10, 2013  Nuti Decl., ¶ 4, Exhibit A; Declaration of Bradley D. Sharp in Support of Motion to Approve Compromise of Controversies Pursuant to Federal Rule of Bankruptcy Procedure 9019 with (1) Wells Fargo Bank; and (2) Lynn Salyer ("Sharp 9019 Decl."), ¶¶ 13,  Exhibit B & 17, Exhibit C.

c)    *No Independent Operations and Thin Capitalization*

52.    Defendants had little or no operations outside of or independent of their relationship with the Debtors.

53.    For example, almost all of SSC's crops were sold to SK Foods, and ninety percent of the crops harvested by SS Farms were processed by SK Foods.  March 9, 2010 Seymour Decl., ¶¶ 23-27.

54.    As a further example, SSC I and SSC II had two sources of revenue.  SK Foods paid to discharge wastewater onto land to which they hold title (but which, as set forth below, was provided to them by SK Foods for no consideration).  They also grew crops which they

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1    sold exclusively to SK Foods.  SSC I and SSC II have had no further operations since the sale

2    of the Debtor's operating assets—their entire business was limited to growing crops for SK

3    Foods and receiving discharged wastewater from SK Foods.  Further, SSC I and SSC II never

4    operated at a profit.  In each year of their existence, their expenses were significantly more

5    than their revenue.  June 12, 2013 Seymour Decl., ¶¶ 27-28.

6         55.    The Defendants were never capitalized by their ostensible owners or operated for

7    profit.  March 9, 2010 Seymour Declaration, ¶¶ 31-32.

8              d)    *No Arms Length Dealing Between Debtor and Defendants*

9         56.    The Debtors and the Defendants did not deal with each other at arm's length.

10   Money was transferred back and forth between the Defendants when a Defendant needed

11   money, not necessarily when it was due under a contract or when the Defendant provided some

12   goods or services to the Debtors.  Payment of inter-company obligations was frequently

13   deferred and 'caught-up' at various intervals, often at the end of a tax year.  March 9, 2010

14   Seymour Decl., ¶ 54-58, 69 & 85; Sharp 9019 Decl., ¶ 17, Exhibit C.

15        57.    The pricing of products or services provided by one Defendant to another was

16   not negotiated, but rather, was set by Salyer who controlled both parties.  Salyer also

17   retroactively reset prices charged to SK Foods by the Defendants.  For instance, near the end of

18   2008, when SSC III and SS Farms were losing money, Salyer unilaterally changed the terms of

19   the contracts so that SK Foods was charged additional amounts.  March 9, 2010 Seymour

20   Decl., ¶ 54.

21        58.    In many instances, the Defendants did not have any written contracts with each

22   other or the Debtors.  For instance, although CSSS provided the fiber drums and rail trans-

23   loading for SK Foods, there was no contract describing the terms of this relationship.

24   Similarly, there was no contract with SAFF for the use of the computer system.  March 9, 2010

25   Seymour Decl., ¶ 38.

26        59.    The Debtor and RHM discharged wastewater onto land owned by SSC, SSC I

27   and SSC II without any contractual relationship between the parties.  Eventually, "discharge

28   agreements" were drafted, but the terms of those agreements were never enforced and

- 12 -

payments purportedly under those discharge agreements were made on an *ad hoc* basis whenever the Defendants holding title to the land needed funds. At the direction of Salyer and/or the SSR Trust and/or others acting on their behalf or in concert with them and using confidential information, SSC, SSC I and SSC II purportedly terminated the discharge agreements for the purpose of enhancing their own bargaining position vis-à-vis the Debtor and RHM during the anticipated sale of the Debtor's operating assets. March 9, 2010 Seymour Decl., ¶¶ 52-53.

60.     SSC III was created to take title to a portion of the land previously held by SSC I and SSC II; however, land was never transferred to SSC III and it leased the land on which it grew tomatoes. SSC III grew tomatoes during the 2008 crop year and was paid by SK Foods for its tomato yields. However, it was not part of the waste water agreements. June 12, 2013 Seymour Decl., ¶ 30.

e)     *Shared Records*

61.     The records of Defendants and the Debtors were stored and maintained together. Paper records of the various entities were stored at SK Foods' places of business or in storage units under SK Foods' control. October 9, 2009 Memorandum Decision, p. 11 (DN 853 in No. 09-29162); August 19, 2009 Kline Decl., ¶ 10-15.

62.     The Defendants' electronic documents were stored on computer systems owned and maintained by SK Foods. For instance, electronic documents related to insurance were maintained in a folder on the public drive entitled "Admin/Insurance." Similarly, electronic documents related to human relations activities were stored on the same public drive under the folder "Admin/HR". Financial records from year 2007 and beyond for many of the Defendants were similarly stored in a folder entitled "2007 Monthly Closings." Again, documents relating to numerous Defendants, including SK Foods, were contained within this folder. August 19, 2009 Kline Decl., ¶4-15; August 19, 2009 Seymour Decl., ¶ 17.

63.     All Defendants used the SK Foods e-mail addresses and the SK Foods.com domain name. October 9, 2009 Memorandum Decision, p. 11-14 (DN 853 in No. 09-29162); August 19, 2009 Kline Decl., ¶ 12.

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

- 13 -

64.    SK Foods employees had unfettered access to all of these records, and SK Foods employees also regularly accessed these records for the benefit of, and at the specific request of, the Defendants.  August 19, 2009 Seymour Decl., ¶ 14; September 15, 2009 Putterman Decl., ¶ 5.

f)    *Shared Management*

65.    The Debtors and the Defendants shared management.  Shondale Seymour served as CFO of Debtor and of various Defendants, including Blackstone, SS Farms and SSC.  Lisa Crist was Executive Vice President of Administration of the Debtors and various Defendants. Steve King, SK Foods' former Vice President of Operations, also provided senior management oversight for CSSS and for certain activities of SSC, SSC I and SSC II.  Richard Emmett, SK Foods' former Vice President of Ag Operations, also provided senior management oversight for SS Farms, SSC, SSC I and SSC II.  Jeanne Johnston was responsible for business development matters for the SK Foods Group in its entirety, including marketing materials and also served as Mr. Salyer's executive assistant for all matters relating to the Salyer family's entities.  March 9, 2010 Seymour Decl., ¶¶ 39-50.

66.    Most management was paid by the Debtors, even though they performed services for other entities.  Id.

67.    Individuals in Debtors' accounting department performed accounting functions for many of the Defendants.  This included accounting functions related to the SSC, SSC I, and SSC II (the "Farming Entities") real estate.  SK Foods' IT department performed IT functions for the Defendants.  August 19, 2009 Seymour Decl., ¶ 8; August 19, 2009 Kline Decl., ¶ 9.

68.    As of January 2009, with the exception of one administrative staff and a few farm hands, all other administrative and operations support for SS Farms, SSC, SSC I, SSC II and SK Farm Services were provided for and paid for by SK Foods. These functions included human resources, administration, IS/IT functions and accounting.  March 9, 2010 Seymour Decl., ¶ 50.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHDATA 4713258_3

g) *Commingling of Assets and Use of the Debtors' Assets to Benefit Defendants*

69.    Debtors made payments on invoices for liabilities incurred by other related entities, reimbursed related entities for costs spent on tenant improvements at the headquarters locations in Monterey, and provided funding to certain related entities to repay intercompany liability of other related entities with limited apparent benefit to the Debtors.  Declaration of Rex Homme in Support of Motion for Default Judgment, or Alternatively, Motion for Summary Judgment (Doc. No 651. In No. 10-2014) ("Homme Decl."), ¶ 34, Exhibit 2.

70.    The Debtors and the Defendants engaged in a significant number of related party transactions in which funds were diverted from the Debtors to Defendants without an adequate explanation.  As of January 31, 2009, five different Defendants owed SK Foods approximately $10 million.  After February 28, 2008, an additional $6 million flowed between the Debtors and Defendants.  May 11, 2009 Declaration of Paul Forgue (DN 56 in No. 09-29162 ("Forgue Decl."), ¶ 17.

71.    There are innumerable examples of other intercompany transfers for no legitimate reason spanning many years up to and including 2009.  In December 2006, $4 million from SK Foods were used to allow two other related entities, RHM and SK Aviation to make tax prepayments.  In April 2009, Salyer withdrew $1.7 million from SS Farms and deposited those funds into his personal account.  He represented that he was using those funds to pay down a note on which SSC was an obligor, and that by paying off this note, the SSC land could be used as collateral for a separate loan to another Salyer entity, SAFF.  March 9, 2010 Seymour Decl., ¶¶ 58, 68-83.

h) *Impossibility of Identifying the Asset of Each Defendant*

72.    It is impossible to identify which assets belong to the Debtors and which belong to Defendants.  SK Foods itself attempted to reconcile various intercompany transactions when various lenders started questioning the practices.  Despite many months of attempting to track all such transactions and reconcile the books of the various Defendants, SK Foods ultimately determined it was not possible to do so.  March 9, 2010 Seymour Decl., ¶¶ 86-90.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

- 15 -

73.     After analyzing the books and records of the Debtors regarding numerous transfers between the Debtors and seven of the Defendants, an independent forensic accountant has concluded that no reliable identification and allocation of assets is possible between the Debtors on the one hand and defendants SKPM, SS Farms, SSC, SSC I, SSC II and SSC III on the other.  Homme Decl., ¶ 6.

74.     Further, the identification of the respective assets of the Debtors and Defendants is further complicated by the fact that the Trustee's equitable claims to Defendants assets would also need to be resolved.  For instance, the Trustee has initiated a complaint seeking to quiet title pursuant to California Code of Civil Procedure § 760.020 to certain "wastewater" real properties allegedly owned by SSC, SSC I, and SSC II to determine that the estate is the legal and equitable owner of those properties.  *See* Sharp v. SSC Farms I, LLC, et al., Adv. Proc. 09-02692-D-11 (the "Quiet Title Action").

i)     *Improper Diversion of Assets*

75.     On numerous occasions, assets were diverted away from the Debtors and to Defendants, apparently for the purpose of benefiting Salyer.  For example:

a.   prior to December 2008, SK Foods owned certain machinery and equipment used in the production of fiber drums in which tomato paste was stored ("Drum Line").  Salyer caused the Debtors to transfer the Drum Line to another non-debtor entity he controlled for no consideration.  Civil Minutes re Motion/Application for Summary Judgment, dated February 13, 2013 at 2-3 (DN 509 in Adv. Proc. 09-02543).

b.   SK Foods and Westlands Water District entered into a Real Estate Purchase and Sale Agreement and Escrow Instructions on October 25, 2005 for real property upon which SK Foods would be permitted to discharge wastewater generated in its processing operations.  Pursuant to that Agreement, SK Foods acquired the right to purchase 30 parcels of land near the Debtors' Lemoore, California facility at $400.00 per acre, for a total of $1,040,912.00.  After October 25, 2005, several amendments were made to the purchase agreement with

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHDATA 4713258_3

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

Westlands in order to extend the closing date to coincide with the expected issuance of permits from the California Regional Water Quality Review Board allowing the Debtors to discharge wastewater.   Each such amendment was executed by SK Foods.  The closing of the sale of the Westlands parcels ultimately occurred on or about September 13, 2007.  Although no written assignment of the Debtors' rights under the Westlands purchase agreement occurred and SK Foods received no consideration in exchange, at the closing, title to this property was not transferred to SK Foods.  Instead, SSC I and SSC II took title to the various parcels.  March 9, 2010 Seymour Decl., ¶ 61-63, Exhibits 2, 3 & 5.

c.  SK Foods also funded an aggregate of $2.2 million to pay the cash portion of the purchase price for two other parcels of land known as the Tiahrt parcel and the Rogers parcel upon which wastewater was discharged.  However, title to the Tiahrt parcel and the Rogers parcel was taken in the name of SSC.  March 9, 2010 Seymour Decl., ¶ 65-67.

d.  In the fall of 2009, Salyer instructed his assistant Jeanie Johnson to close the bank accounts of all Defendant entities located at the Bank of the West and to move those funds to a single account located at Mechanics Bank in San Francisco.  From the Mechanics Bank account, the following sums of money were transferred from accounts in the name of the Defendants to bank accounts in Liechtenstein, the West Indies and Australia, among other places.

| Date | From | To | Amount | Source |
|------|------|-----|--------|--------|
| 4/16/09 | SS Farms (Bank of the West) | SS Farms II, LLC (Mechanics Bank) | $1,500,000 | Exhibit X |
| 6/30/09 | Mechanics Bank | First Republic Bank, San Francisco | $1,000,000 | Exhibit KK |
| 9/4/09 | Mechanics Bank | Volksbank Liechtenstein and Fast Falcon, LLC in Charleston, Nevis West Indies | $250,000 | Exhibit LL |

- 17 -

| Date | From | To | Amount | Source |
|------|------|-----|--------|--------|
| 9/10/09 | Mechanics Bank | Volksbank Liechtenstein and Fast Falcon, LLC in Charleston, Nevis West Indies | $250,000 | Exhibit LL |
| 9/11/09 | Mechanics Bank | Volksbank Liechtenstein and Fast Falcon, LLC in Charleston, Nevis West Indies | $250,000 | Exhibit LL, HH, II |
| 9/14/09 | Mechanics Bank | Volksbank Liechtenstein and Fast Falcon, LLC in Charleston, Nevis West Indies | $2,750,000 | Exhibit LL, HH, II |
| 9/17/09 | SK PM Corp (Bank of the West) | SSC Farms II, LLC (Mechanics Bank) | $27,375.44 | Exhibit W (SSD 00214) |
| 9/17/09 | SK Foods, LLC (Bank of the West) | SSC Farms II, LLC (Mechanics Bank) | $17,911.47 | Exhibit W (SSD 00215) |
| 9/17/09 | SARS, LLC (Bank of the West) | SSC Farms II, LLC (Mechanics Bank) | $35,459.17 | Exhibit W (SSD 00216) |
| 9/17/09 | CSSS, LP (Bank of the West) | SSC Farms II, LLC (Mechanics Bank) | $25,054.27 | Exhibit W (SSD 00217) |
| 9/17/09 | CSSS, LP (Bank of the West) | SSC Farms II, LLC (Mechanics Bank) | $10,201.20 | Exhibit W (SSD 00218) |
| 9/17/09 | SS Farms, LLC (Bank of the West) | SSC Farms II, LLC (Mechanics Bank) | $9,043.83 | Exhibit W (SSD 00219) |
| 9/17/09 | SS Farms, LLC (Bank of the West) | SSC Farms II, LLC (Mechanics Bank) | $32,895.92 | Exhibit W (SSD 00220) |
| 9/17/09 | SSC Farming, LLC (Bank of the West) | SSC Farms II, LLC (Mechanics Bank) | $4,934.49 | Exhibit W (SSD 00221) |
| 9/17/09 | SSC Farming, LLC (Bank of the West) | SSC Farms II, LLC (Mechanics Bank) | $20,529.18 | Exhibit W (SSD 00222) |
| 9/17/09 | SSC Farms I, LLC (Bank of the West) | SSC Farms II, LLC (Mechanics Bank) | $83.47 | Exhibit W (SSD 00223) |

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHDATA 4713258_3

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

| Date | From | To | Amount | Source |
|---|---|---|---|---|
| 9/17/09 | SSC Farms II, LLC (Bank of the West) | SSC Farms II, LLC (Mechanics Bank) | $69.47 | Exhibit W (SSD 00224) |
| 9/17/09 | SSC Farms III, LLC (Bank of the West) | SSC Farms II, LLC (Mechanics Bank) | $33,712.04 | Exhibit W (SSD 00225) |
| 9/28/09 | SSC Farms II, LLC (Mechanics Bank) | First Republic Bank, San Francisco | $100,000 | Exhibit KK |
| 9/30/09 | SSC Farms II, LLC (Mechanics Bank) | First Republic Bank, San Francisco | $100,000 | Exhibit KK |
| 10/13/09 | Mechanics Bank | Volksbank Liechtenstein and Fast Falcon, LLC in Charleston, Nevis West Indies | $250,000 | Exhibit LL |
| 11/10/09 | Scott Salyer Revocable Trust (Mechanics Bank) | Westpac Bank (Australia) | $303,837.03 | Exhibit KK |
| 11/12/09 | Scott Salyer Revocable Trust (Mechanics Bank) | Westpac Bank (Australia) | $508,808.47 | Exhibit KK |

Affidavit of Special Agent Paul S. Artley, contained within Request for Judicial Notice in Support of Trustee's Ex Parte Motion for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction ("RJN"), Exhibit 1-C.

e.  One of the overseas accounts was held in the name of "Fast Falcon," and a notation in Salyer's diary indicates that he intended to distribute the "F. Falcon $" to himself personally.  Mr. Salyer is also the settlor and a beneficiary of the Hawker Sydley Trust, a trust organized under the laws of the Cook Islands that serves as the sole member of Fast Falcon, LLC.  Affidavit of Special Agent Paul S. Artley, RJN, Exhibit 1-C; April 26, 2012 Declaration of James Heiser in Support of Summary Judgment (DN 33 in No. 12-2169) ("Heiser Decl."), ¶ 6, Exhibit E.

- 19 -

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

f.  In 2002, the Debtors purchased shares of the stock in an entity known as SK Foods Australia Pty Ltd. ("SKFA Stock").  At a time on or after June 2009, Salyer purported to transfer the SKFA Stock to Fast Falcon in order to shield it from the Trustee and other creditors.  August 2, 2012 Declaration of Bradley S. Sharp in Support of Summary Judgment (DN 290 in No. 11-2337) ("August 2, 2012 Sharp Decl.), ¶ 6.

g.  Salyer used Monterey Peninsula Farming, LLC ("Monterey") as the conduit through which he purported to transfer the SKFA Stock and the rights to a loan made by the Debtors to SK Foods Australia Pty. Ltd. ("Intercompany Loan") to Fast Falcon.  Moreover, in January 2009, a few months before SK Foods defaulted on its loan with BMO, Monterey served as the conduit through which Salyer diverted SKF, LLC's primary asset—its interest in SK Foods International. *See Bank of Montreal v. SK Food, LLC, et al.*, 476 B.R. 588, 589 (N.D. Cal. 2012).

76.  Defendant SSC Farming was twice held in contempt for violating the Preliminary Injunction entered in this action at a time when it was under the control of Scott Salyer and agents appointed at his direction.  Order Holding the Following Entities and Individuals in Contempt for Violation of Preliminary Injunction:  SSC Farming, LLC; Robert Pruett; Collins & Associates: and Cary Collins, dated December 1, 2011 (DN 420 in Adv. Proc. 09-02692); Order Holding the Following Entities and Individuals in Contempt for Violation of Preliminary Injunction:  SSC Farming, LLC; Robert Pruett; Collins & Associates: and Cary Collins, dated March 9, 2012 (DN 437).  Defendants SKPM and Monterey failed to comply with a partial judgment entered on November 29, 2012 in Adv. Proc. No. 11-2337 that, among other things, determined that the Trustee was the owner of the SKFA Stock and Intercompany Loan, and it ordered Defendants to withdraw all proofs of debt and dismiss all challenges to the Trustee's efforts to recover those assets from SKFA's liquidators in Australia.  April 10, 2013 Declaration of Bradley S. Sharp in Support of Motion for Entry of Default Judgment or Alternatively for Summary Judgment (DN 650 in No. 10-2014) ("April 10, 2013 Sharp Decl."), ¶ 7.

- 20 -

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

j)    *Impact of Substantive Consolidation on All Creditors*

77.    The foregoing undisputed facts establish that Defendants and the Debtors are closely related entities. That undisputed fact gives rise to a presumption that the creditors of each Defendant generally did not rely on the separateness of that Defendant in deciding to extend credit. *See* In re Bonham, 229 F.3d 750, 767 (9th Cir. 2000). Defendants have not proffered any evidence to rebut this presumption. Wells Fargo Bank contended in its opposition to substantive consolidation that it relied on the separateness of SS Farms, Blackstone, SSC in extending a loan to those entities. DN 715 at 10-12.[3] The Trustee disputes that contention. DN 736 at 7-8.

78.    The Court finds that substantive consolidation will ensure that the Defendants' assets are shared ratably among all creditors, and that preference is not given to any creditor or the equity owners of the Defendants.

79.    The Court finds further that substantive consolidation will benefit creditors by avoiding the cost (assuming it is even possible) of trying to determine the proper characterization of the multitude of intercompany transfers in order to ascertain who owes what to whom. Substantive consolidation will also benefit all creditors because it will avoid the cost and expense of resolving the equitable ownership claims SK Foods has against the Defendants as a result of the fraudulent transfers of assets and the usurpation of corporate opportunities by Salyer (for example, the claims made in Adv. Proc. No. 09-2962).

80.    Lastly, the Court finds that creditors of both the Debtors and the Defendants will benefit from substantive consolidation because it will place the Defendants assets under the control of a court-supervised fiduciary rather than Salyer who has shown himself determined to move assets into Fast Falcon in order to avoid paying creditors.

2.    *Additional Facts Relating to the StoneTurn Defendants*

---

[3] Lynn Salyer made a similar contention regarding SSR Trust, DN 739 at 11-12, but the Trustee no longer seeks to consolidate its assets into the Debtors' Estate.

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                    PHDATA 4713258_3

As to Defendants SKPM, SS Farms, SSC, SSC I, SSC II, and SSCIII (hereinafter referred to as the "StoneTurn Defendants"),[4] the Court finds the following additional facts undisputed:

81.    From 2000-2009, SK Foods recorded approximately 1,200 transactions totaling a net cash outflow from SK Foods of approximately $205 million involving the StoneTurn Defendants. Homme Decl., ¶ 18.

82.    An analysis of approximately 51% of the number of the recorded transactions (representing 77% of the dollar value of the recorded transactions) between the Debtors and the StoneTurn Defendants was undertaken in order to evaluate the available supporting documentation for the recorded transactions. The analysis revealed that supporting documentation for approximately 52% of the number of the recorded transactions (representing 75% of the dollar value of the recorded transactions) could not be identified or was inadequate. Homme Decl., ¶¶ 11-12, 18 & 29, Exh. B. The following table identifies the number and gross dollar amount of intercompany transactions drawn from the sampling taken by StoneTurn between the identified Defendant and the Debtors, and compares the number and magnitude of transactions where it was or was not possible to ascertain the purpose of the transfer:

| Entity | Total Txns | Total Dollar Amt. | Number Adequate | Dollar Amount Adequate | Number Inadequate | Dollar Amount Inadequate |
|---|---|---|---|---|---|---|
| SKPM | 41 | $16,751,192 | 5 | $7,178,634 | 36 | $9,572,558 |
| SS Farms | 483 | $360,881,717 | 254 | $90,825,867 | 229 | $270,055,850 |
| SSC Farming | 48 | $32,584,006 | 8 | $3,099,688 | 40 | $29,484,318 |
| SSC Farms I | 7 | $847,582 | 5 | $423,844 | 2 | $423,738 |
| SSC Farms II | 13 | $1,974,724 | 6 | $865,199 | 7 | $1,109,525 |
| SSC Farms III | 5 | $1,456,512 | 1 | $282,620 | 4 | $1,173,892 |

---

[4] These six Defendants are designated as the "StoneTurn Defendants" because StoneTurn Group, LLP, a forensic accounting firm retained by the Trustee, analyzed intercompany transactions between the Debtors and those entities, the results of which are set forth in the declaration of Rex Homme. *See* DN 651. Despite how the term was defined in the Trustee's Motion, the term StoneTurn Defendants as used herein does not include SK Frozen Foods.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

83.     Without the supporting documentation for the recorded transactions, it is not possible to reliably determine the nature and purpose of the transactions, which in turn makes it impossible to assess whether the transactions were recorded on the parties' financial statements correctly, *e.g.*, whether a payment of a good or service should be capitalized (recorded on the balance sheet, such as intercompany receivable) or expensed (recorded on the income statement), or to determine if the transaction is allocated to the proper contra party. Id.

84.     The lack of appropriate documentation establishing the purposes of the recorded intercompany transfers and the lack of documentation regarding related party transactions that were not recorded accordingly makes it impossible to reliably determine whether in reality the StoneTurn Defendants owe money to the Debtors or vice-versa. Since the right to payment of money is an asset of the entity to whom the payment is owed, the lack of documentation means that one cannot reliably determine whether the Debtors or the StoneTurn Defendants hold rights to payment against the related party (or vice versa), which in turn means that the assets of the respective entities cannot be accurately identified and/or accounted for. Homme Decl., ¶¶ 11-12 & 29.

85.     Shared overhead costs incurred and paid for by SK Foods were not rationally allocated between the StoneTurn Defendants and the Debtors and documentation from which such an allocation can be reconstructed appear not to exist. As a result, it is impossible to reliably determine the extent to which the StoneTurn Defendants are indebted to the Debtors on account of allocated overhead, which is a further reason that the respective assets and liabilities of the StoneTurn Defendants and the Debtors can be reliably determined. Homme Decl. ¶15, ¶¶40-43.

86.     The evidence and argument submitted by Defendants' in their Opposition to Trustee's Motion to Amend Preliminary Injunction and Farming Entities' Counter-Motion to Dissolve Preliminary Injunction, filed December 30, 2011 [DN 481] does not address the absence of corporate records, the failure to observe entity separateness and the failure to consistently or rationally allocate overhead expenses. The Defendants' opposition and counter-motion admits that there was a failure to allocate related party expenses, and therefore,

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                    PHDATA 4713258_3

that the respective financial statements of the Debtors and the StoneTurn Defendants did not accurately identify the assets and liabilities of the entities because all necessary intercompany transactions were not recorded. Id., ¶ 44.

87.    Now that the majority of SK Foods' and the StoneTurn Defendants' prior management and accounting staff are no longer employed, the difficulty of reconstructing the documentation and identifying the purposes for the intercompany transfers has only grown. Id., ¶ 29.

88.    Based upon all of the foregoing, the Court finds that the manner in which intercompany accounts were kept between the Debtors and StoneTurn Defendants makes it impossible to reliably determine who owes what to whom, and correspondingly, to accurately identify the assets and liabilities of each entity.

89.    The Court further finds that there was a unity of interest and common ownership between the StoneTurn Defendants and the Debtors, the StoneTurn Defendants were but instrumentalities of the Debtors with no separate existence, there was commingling of assets and no clear demarcation between the affairs of the Debtors and the StoneTurn Defendants, and adhering to the separate corporate entities theory would result in an injustice to the Debtors' creditors.

3.    *Additional Facts Relating to SKPM*

As to Defendant SKPM, the Court finds the following additional facts undisputed:

90.    Since at least 2005, SKPM has had no actual business operations, was the General Partner of SK Foods, and has merely served as the nominal owner of certain insurances policies (e.g., workers comp policies) related to SK Foods' operations.  SKPM retained a general ledger until the conversion from the AAS software to the DAX system, but its books stopped being maintained by SK Foods in 2007 due to a lack of accounting staff. June 12, 2013 Seymour Decl., ¶ 19.

91.    SK Foods provided the funds to make premium payments on behalf of SKPM and it was SK Foods that received the benefits of the insurance policies.  For instance, SK Foods received and kept any workers compensation audit refunds issued by the captive

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                         PHDATA 4713258_3

insurance carrier. Of note, the workers' compensation policy covered all SK Foods entities' employees including CSSS employees (not included among the Defendants). Each SK Foods entities' allocated premiums would be billed out via intercompany entries, but eventually funds received from SK Foods would be used to repay the related party billings. June 12, 2013 Seymour Decl., ¶ 19.

92.    Further, Salyer, SKPM, and/or others working at Salyer's direction caused SK Foods to attempt to transfer ownership of SK Foods' Australian and New Zealand subsidiaries to other Salyer-controlled entities without any consideration or benefit to SK Foods. Further, they purported to "back date" the transfer to November 1, 2006. March 9, 2010 Seymour Decl., ¶ 93.

93.    According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to SKPM:

| Date | Amount | Description in General Ledger |
| --- | --- | --- |
| 1/28/2008 | $2,298,396 | I/C CASH – SKPM CORP |
| 11/25/2008 | $126,191 | Accounts Payable – Related Party |

March 9, 2010 Seymour Decl., ¶ 112.

### 4.    Additional Facts Relating to Blackstone

As to Defendant Blackstone, the Court finds the following additional facts undisputed:

94.    Until the sale of equipment from Blackstone to SSC in February 2008, Blackstone held title to certain farming equipment utilized by the Debtors and certain Defendants. Blackstone also served as a conduit through which funds of SK Foods and/or the Defendants flowed to other Defendants, as well as a source of funds for Salyer personally. June 12, 2013 Seymour Decl., ¶ 13.

95.    Although Blackstone initially held title to various assets (land and equipment) used by certain Defendants, in August 2007, it sold off its Visalia and Corcoran ranches to enable Salyer to meet various personal obligations. Funds from the sale of the assets were loaned to SSC I and SSC II for the purchase of land from Westlands Water District

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                    PHDATA 4713258_3

SCHNEIDER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1   ("WWD") to permit SK Foods to discharge waste water from its plant during tomato processing.

2   SK Foods initially entered into the agreement for the purchase of the WWD land; however,

3   SSC I and SSC II borrowed funds from Blackstone to complete the transaction.  By the time of

4   SK Foods' bankruptcy filing, Blackstone was merely a shell without any business operations or

5   assets, with the possible exception of some remaining cash.  June 12, 2013 Seymour Decl., ¶ 13.

6        96.    The Court finds further that there was a unity of interest and common ownership

7   between Blackstone and the Debtors, Blackstone was but an instrumentality of the Debtors with

8   no separate existence, there was commingling of assets and no clear demarcation between the

9   affairs of the Debtors and Blackstone, and adhering to the separate corporate entities theory

10  would result in an injustice to the Debtors' creditors.

11        5.    *Additional Facts Relating to Monterey*

12       As to Defendant Monterey, the Court finds the following additional facts undisputed:

13       97.    In January 2009, Salyer formed Defendant Monterey.  Monterey was formed for

14  the purpose of pooling available assets of the Salyer entities, including the Farming Entities, as

15  well as other entities in which Salyer had an interest.  Monterey never had any business

16  operations prior to 2009.  Like other Defendants, Salyer exercised complete control over

17  Monterey, and its subsistence was entirely dependent upon continued financing from SK Foods.

18  June 12, 2013 Seymour Decl., ¶ 35.

19       98.    As discussed previously, Salyer attempted to use Monterey as the conduit through

20  which to divert the Debtors' stock in SK Foods Australia Pty Ltd for his own purposes.

21       99.    The Court finds that there was a unity of interest and common ownership between

22  Monterey and the Debtors, Monterey was but an instrumentality of the Debtors with no separate

23  existence, there was commingling of assets and no clear demarcation between the affairs of the

24  Debtors and Monterey, and adhering to the separate corporate entities theory would result in an

25  injustice to the Debtors' creditors.

26        6.    *Additional Facts Relating to SK Farms Services*

27       As to Defendant SK Farm Services, the Court finds the following additional facts

28  undisputed:

- 26 -

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

100.   SK Farms Services was formed in December 2007 to centralize purchasing and enable the Debtor and certain other Defendants to negotiate contracts on a larger scale in order to leverage better prices.  Although some initial marketing was begun under its name to test the concept with growers, SK Farms Services never got off the ground and never at any time performed bulk purchasing for SK Foods or any other Defendant.  SK Farms never had any independent operations or assets.  March 9, 2010 Seymour Decl., ¶ 15.

101.   Further, SK Farms Services did not have any officers and relied entirely on SK Foods for its management.  March 9, 2010 Seymour Decl., ¶ 49.

102.   SK Farm Services never had a general ledger.  It apparently was supposed to have been set up on the SAFF servers but this never occurred.  SK Farms Services did at some point designate John Bryce to run the group purchasing, but Mr. Bryce was a SAFF employee and SAFF paid his salary.  SK Farms Services did not have any employees.  In short, SK Farms Services was like other SK Foods entities, such as SMC, a shell entity without any real business structure (*e.g.*, a general ledger, assets or employees).  June 12, 2013 Seymour Decl., ¶ 21.

103.   In December 2007, SK Foods pre-paid $6 million to SK Farms Services for "bulk purchasing services", though the true impetus behind the transfer was to allow Salyer to take advantage of certain tax breaks.  These funds were subsequently transferred to SSC, which then used the money to re-pay a note payable to SK Foods.  Since SK Farm Services never had operations, it could not utilize the funds provided via the prepayment.  Further, it could not repay SK Foods because it had loaned the funds to SSC; so as of June 30, 2008, SK Foods reclassified the prepayment into a receivable.  June 12, 2013 Seymour Decl., ¶ 22.

104.   The Court finds that there was a unity of interest and common ownership between SK Farms Services and the Debtors, SK Farms Services was but an instrumentality of the Debtors with no separate existence, there was commingling of assets and no clear demarcation between the affairs of the Debtors and SK Farms Services, and adhering to the separate corporate entities theory would result in an injustice to the Debtors' creditors.

7.   *Additional Facts Relating to SKF*

As to Defendant SKF, the Court finds the following additional facts undisputed:

- 27 -

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

105.    SKF was formed under the laws of Nevada for the sole purpose of holding interests in certain foreign affiliates of SK Foods based on the perceived tax benefits. SKF is a shell company and has never had any actual business operations or even a theoretical role in the production and processing of tomatoes or other vegetables. June 12, 2013 Seymour Decl., ¶ 11.

106.    The Court finds that there was a unity of interest and common ownership between the SKF and the Debtors, SKF was but an instrumentality of the bankrupt with no separate existence, there was commingling of assets and no clear demarcation between the affairs of the Debtors and SKF, and adhering to the separate corporate entities theory would result in an injustice to the Debtors' creditors.

### 7.    *Additional Facts Relating to SKF Canning*

As to Defendant SKF Canning, the Court finds the following additional facts undisputed:

107.    SKF Canning was formed under the laws of Nevada for the sole purpose of holding the ownership interest in RHM. SKF Canning is a shell company and has never had any actual business operations or even a theoretical role in the production and processing of tomatoes. June 12, 2013 Seymour Decl., ¶ 12.

108.    The Court finds further that there was a unity of interest and common ownership between SKF Canning and the Debtors, SKF Canning was but an instrumentality of the Debtors with no separate existence, there was commingling of assets and no clear demarcation between the affairs of the Debtors and SKF Canning, and adhering to the separate corporate entities theory would result in an injustice to the Debtors' creditors.

### 8.    *Additional Facts Relating to SMC*

As to Defendant SMC, the Court finds the following additional facts undisputed:

109.    SMC was also mere shell, instrumentality or conduit of SK Foods. On paper, SMC was formed to receive "management fees" from SS Farms and other entities, allegedly for services provided by SK Foods' employees. However, in reality, SMC served no other purpose than to act as a conduit through which funds of SK Foods and/or other Salyer entities flowed to Salyer and/or one of Salyer's ex-wives to satisfy Salyer's personal obligations under

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHDATA 4713258_3

a divorce settlement. For example, Salyer utilized SMC as conduit through which he paid his ex-wife $50k per month and a significant payment in the approximate amount of $1 million every December pursuant to the terms of payment schedule. SMC was also used as conduit for SK Foods to pay for the DAX software purchase and software support agreements. June 12, 2013 Seymour Decl., ¶ 15.

110. The Court finds that there was a unity of interest and common ownership between SMC and the Debtors, SMC was but an instrumentality of the Debtors with no separate existence, there was commingling of assets and no clear demarcation between the affairs of the Debtors and SMC, and adhering to the separate corporate entities theory would result in an injustice to the Debtors' creditors.

**D.    Withdrawal of Wells Fargo Bank and Lynne Salyer Objections**

111. Wells Fargo filed its opposition to the Motion for substantive consolidation on August 5, 2013 (DN 715). Lynne Salyer filed her opposition to the Motion for substantive consolidation on August 14, 2013 (DN 739).

112. The Trustee subsequently reached settlements with Wells Fargo and Ms. Salyer. Sharp 9019 Decl., ¶ 10, Exhibit A.

113. Under the terms of the settlement approved by this Court on October __, 2013, Wells Fargo and Ms. Salyer have withdrawn their objections and consented to substantive consolidation retroactive to May 5, 2009 on the terms more particularly described in the Sharp 9019 Decl.

114. Both the Creditors Committee and the BMO supported the settlements between the Trustee, Wells Fargo, and Ms. Salyer. Sharp 9019 Decl., ¶ 36.

## CONCLUSIONS OF LAW

**I.    LEGAL REQUIREMENTS FOR SUBSTANTIVE CONSOLIDATION**

1. Substantive consolidation is an equitable remedy that combines the assets and liabilities of separate and distinct, but related, legal entities into a single pool and treats them as though they belong to a single entity. In re Bonham, 229 F.3d 750, 764 (9th Cir. 2000). Substantive consolidation "enabl[es] a bankruptcy court to disregard separate corporate entities,

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

to pierce their corporate veils in the usual metaphor, in order to reach assets for the satisfaction of debts of a related corporation." Id. The overriding purpose of substantive consolidation is to ensure the equitable treatment of all creditors. Substantive consolidation is designed to prevent a debtor from insulating funds and defeating creditors by transferring assets and funds among various interrelated companies. Id.

2.    While acknowledging that the determination ultimately must be made by a searching inquiry into the facts of each case,[5] the *Bonham* court adopted the analysis and standards for substantive consolidation articulated by the Second Circuit in In re Augie/Restivo Baking Co., Ltd., 860 F.2d 515 (2d Cir. 1988). *See* Bonham, 229 F.3d at 766. *Augie/Restivo* canvassed the case law and identified a series of circumstances in which courts had found it appropriate to substantively consolidate, including the following that are relevant to this motion:

a)    whether creditors knowingly deal with corporations as a unit;

b)    whether interrelationships of group were closely entangled;

c)    whether entanglement of business affairs of related corporations was so extensive that the cost of untangling would outweigh any benefit to creditors;

d)    the presence or absence of consolidated financial statements;

e)    the difficulty in segregating individual debtors' assets and liabilities;

f)    whether there was a unity of interests and ownership; and

g)    whether assets were transferred without observance of corporate formalities.

---

[5] The Court in *Bonham* stated:

"The bankruptcy court did not err in using its substantive consolidation power in this case. Two broad themes have emerged from substantive consolidation case law: in ordering substantive consolidation, courts must (1) consider whether there is a disregard of corporate formalities and commingling of assets by various entities; and (2) balance the benefits that substantive consolidation would bring against the harms that it would cause. [citations omitted]. No uniform guideline for determining when to order substantive consolidation has emerged. Rather,'[o]nly through a searching review of the record, on a case-by-case basis, can a court ensure that substantive consolidation effects its sole aim: fairness to all creditors.'" [citations omitted] Bonham, 229 F.3d at 765.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1    Augie/Restivo, 860 F.2d at 518.  The Second Circuit distilled the foregoing circumstances down

2    as expressing two underlying themes, stating:

> An examination of those cases, however, reveals that these considerations are
> merely variants on two critical factors: (i) whether creditors dealt with the entities
> as a single economic unit and 'did not rely on their separate identity in extending
> credit' [citations omitted]; or (ii) whether the affairs of the debtor are so entangled
> that consolidation will benefit all creditors. [citation omitted].

6    Id.  Thus, the two factors identified by *Augie/Restivo* are a short-hand way to categorize a

7    number of unique circumstances which justify substantive consolidation.  For ease of

8    discussion below, the Court will refer to the first factor as the "creditor expectation"

9    rationale, and the second factor as the "entanglement" rationale.

10          3.          Consolidation under the second factor, entanglement of the debtor's affairs, is

11   justified where "the time and expense necessary even to attempt to unscramble them [is] so

12   substantial as to threaten the realization of any net assets for all the creditors or where no

13   accurate identification and allocation of assets is possible."  Id. at 519.  One or the other

14   circumstance (great expense or impossibility) is sufficient; it is not necessary to establish both.

15   Id.

16          4.          In applying *Augie/Restivo*'s approach, *Bonham* concluded further that substantive

17   consolidation was appropriate under the "entanglement" rationale where there was a unity of

18   interest and common ownership between the debtor and the target entities, the target entities

19   were "but instrumentalities of the bankrupt with no separate existence," there was commingling

20   of assets and no clear demarcation between the affairs of the debtor and the target entities, and

21   adhering to the separate corporate entities theory would result in an injustice to the bankrupt's

22   creditors.  Bonham, 229 F.3d at 767.  In short, *Bonham* concluded that the presence of traditional

23   "alter ego" factors formed a basis to find that the affairs of the debtor are so entangled such that

24   consolidation will benefit all creditors.  In re Meruelo Maddux Properties, Inc., 667 F.3d 1072,

25   1075 n.1 (9th Cir. 2012) (citing *Bonham* and stating "Appellate courts have ratified substantive

26   consolidation orders when, for example, the debtors have abused corporate formalities, or

27   creditors have treated the separate entities as a single unit and the business affairs of the

28   consolidated entities were hopelessly entangled.").

FINDINGS OF FACT AND CONCLUSIONS OF LAW

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

5.     Turning to the "creditor expectation" rationale, *Bonham* held that there is a presumption that creditors of closely related entities did not rely on the separate credit of each, and that the parties opposing substantive consolidation have the burden of proof to establish that creditors in fact so relied on the separate credit of the target entities.  *Bonham*, 229 F.3d at 767.

6.     Accordingly, substantive consolidation is proper in circumstances where creditors have treated the separate entities as a single unit, or the business affairs of the consolidated entities are hopelessly entangled.  Hopeless entanglement can be established by proving that there has been an abuse of the corporate form and the other typical alter ego elements. Alternatively, where close interrelationships are established between the debtor and target entities, it will be presumed that the target's creditors did not rely on the separate credit of the targets, and a court is justified in ordering substantive consolidation in the absence of proof to the contrary by the parties opposing that relief.

## II.     CONCLUSIONS OF LAW REGARDING THE TRUSTEE'S MOTION FOR ENTRY OF DEFAULT JUDGMENT

### A.     <u>Standard for Entry of Default Judgment</u>

7.     Once a court determines that the defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.  <u>Danning v. Lavine</u>, 572 F.2d 1386, 1388-89 (9th Cir. 1978) (factual allegations in the complaint, including allegations of ultimate facts, are taken as true in an application for entry of default judgment).  In addition, the party seeking entry of the default judgment is entitled to have all reasonable inferences from well-pleaded allegations in the complaint drawn in its favor.  <u>Finkel v. Romanowicz</u>, 577 F.3d 79, 84 (2d Cir. 2009) ("In light of Romanowicz's default, a court is required to accept all of the Joint Board's factual allegations as true and draw all reasonable inferences in its favor.").  Although it is true that a *court* retains discretion to require the plaintiff to put on additional evidence it believes is necessary to establish liability, *see* Fed. R. Civ. Proc. 55(b)(2);  10A Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE 3D § 2688 n.8 (1998, Supp. 2012), "[o]nce the default is established, defendant has no further standing to

1  contest the factual allegations of plaintiff's claim for relief." Taylor v. City of Ballwin, Mo.,

2  859 F.2d 1330, 1333 n.7 (8th Cir. 1988).

3  **B.    The Well-Plead Allegations in the Complaint Establish That
   Defendants Should Be Substantively Consolidated**

4

5  8.    Because a default had been entered against Defendants and not set aside,

6  Defendants had no standing to contest the factual allegations of the Trustee's claim for relief.

7  *Taylor*, 859 F.2d at 1133 n. 7 (8th Cir. 1988).

8  9.    Further, as noted, for purposes of entering a default judgment, all well-plead

9  factual allegations in a complaint are to be taken as true, and all reasonable inferences from those

10  facts should be drawn in favor of the plaintiff. The Trustee's Complaint filed on January 10,

11  2010 makes the following factual allegations – all of which are presumed true:

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

12  • Mr. Salyer and his daughters, or trusts for which they are beneficiaries,
own, directly or indirectly in various combinations, 100% of each of the Owner

13  Defendants and the Affiliated Defendants.[6] Complaint, ¶ 26

14  • At all relevant periods Scott Salyer, by or through entities he owned and
controlled, controlled, operated and managed the Debtor and each of the Owner

15  Defendants and Affiliated Defendants. Complaint, ¶ 34

16  • The Debtor and the Defendants at all relevant times formed a cohesive
single enterprise that together enabled the Debtor to grow, harvest, process, ready

17  for shipment and ship tomatoes, other crops and products. Complaint, ¶ 43

18  • From a financial perspective, the Defendants and the Foreign Entities were
entirely dependent upon continued financing from SK Foods to remain operating.

19  Complaint, ¶ 54

20  • Employees of SK Foods could access land and use equipment nominally
owned by any particular Affiliated Defendant at their discretion without seeking

21  or needing permission. Complaint, ¶ 59

22  • Salyer and others in management of SK Foods and the Affiliated
Defendants held themselves out to the public and their creditors as a single

23  enterprise. Salyer and others in management of SK Foods and the Affiliated
Defendants sometimes referred to SK Foods and the Defendants as "SK Foods

24  Group". The Debtor's marketing brochures described SK Foods Group as "one of
the world's leading international growers and processors of vegetable products,"

25

26  [6] In the Complaint, the phrase "Owner Defendants" is used to refer to Defendants the SSR Trust,
SKPM, SKF, SKF Canning and the phrase "Affiliated Defendants" is used to refer to Defendants

27  Blackstone, Monterey, SMC, SK Farms Services, SK Frozen Foods, SSS Farms, SSC, SSC I,
SSC II,  and SSC III.  Complaint ¶¶ 3-19.

28

FINDINGS OF FACT AND CONCLUSIONS OF LAW                    PHDATA 4713258_3

confirming that the Debtor and the Defendants operated as a single enterprise. Complaint, ¶ 60.

• The number of related entities and the relationships between and among the Defendants has caused confusion as to on whose behalf certain acts have been taken. Complaint, ¶ 63.

• Salyer purposely blurred the legal distinctions among the Debtor, the Owner Defendants and Affiliated Defendants in order to advance his personal objectives. He failed to maintain any separation of legal representation between and among the Debtor, the Owner Defendants and Affiliated Defendants and allowed sophisticated legal counsel to access confidential information of one entity to be used for the benefit of other entities and himself personally. Complaint, ¶ 64.

• Apart from supporting the Debtor's processing business, the Affiliated Defendants have little or no independent operations and could not exist as a going concern but for the financial and operational assistance provided by the Debtor. Complaint, ¶ 65.

• Many, if not all, of the Affiliated Defendants were never capitalized from funds outside the enterprise. The Debtor directly and indirectly provided "intercompany" transfers, alleged "prepaid expenses" or putative loans in order to capitalize the Affiliated Defendants. Complaint, ¶ 74.

• Management for the Affiliated Defendants were employees of SK Foods and paid by SK Foods, even though they performed services for other Defendants. Complaint, ¶ 96.

• As of January 2009, with the exception of one administrative staff and a few farm hands, all other administrative and operations support for SS Farms, SSC, SSC I, SSC II, SK Farms Services, and other Affiliated Defendants were provided for and paid for by SK Foods. These functions included human resources, administration, IS/IT functions, and accounting. Complaint, ¶ 106.

• The Defendants' electronic documents were stored on computer systems owned and maintained by SK Foods. Complaint, ¶ 118.

• The Debtor and Affiliated Defendants routinely performed services and exchanged funds in the absence of formal written agreements or in disregard of the terms of existing written agreements. Complaint, ¶ 126.

• The pricing of products or services provided by one entity to another was not negotiated, but rather, was set by Salyer who controlled both parties. Complaint, ¶ 129.

• SK Foods effectively served as the bank for the Affiliated Defendants, dispensing funds when necessary for their operation and without regard to whether SK Foods received goods or services with a value reasonably equivalent to the money transferred by SK Foods to the Affiliated Defendants. Complaint, ¶ 137.

• There were a significant number of related party transactions in which funds or other assets were diverted from the Debtor to related parties without an adequate explanation. SK Foods regularly issued checks to Affiliated Defendants, and Affiliated Defendants regularly issued checks to each other and/or to SK

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHDATA 4713258_3

Foods without documentation substantiating the purpose of the payment. Complaint, ¶ 139.

• The Debtor and Affiliated Defendants generally did not document whether the "transfers," "loans," or "prepaid expenses" were repaid. Nor was there billing associated with the alleged prepaid expenses to track the extent to which the Debtor in fact received services or goods applied against the prepayments or associated with the loans to track whether they were being repaid. Complaint, ¶ 161

• Based on information known to date, between January 2005 and February 2009, more than $170,000,000 was transferred from SK Foods to related parties, whereas less than $37,000,000 flowed into SK Foods from those related parties. During this time period, therefore, there was a net value of transactions from SK Foods to related parties of more than $133,000,000. Complaint, ¶163.

• SK Foods itself attempted to reconcile these various intercompany transactions when various lenders started questioning the practices. Despite many months of attempting to track all such transactions and the underlying reasons for such transactions, SK Foods ultimately determined it was not possible to determine the purposes for all the transactions and to reconcile the books. Complaint, ¶ 166.

• The Debtor, through the Owner Defendants, exercised complete dominion and control over the Affiliated Defendants, commingled the Debtor's assets with the assets of the Defendants, transferred property from the Debtor to the Defendants, from the Defendants to the Debtor, and among the Defendants, and otherwise treated the Defendants' property as if it were the Debtor's, such that there is a substantial identity between and among the Debtor and the Defendants and the Defendants are mere instrumentalities of the Debtor. Complaint, ¶ 287.

• Because of the intermingling of the assets, liabilities and finances of the Debtor, the Owner Defendants, and the Affiliated Defendants, an accurate identification and allocation of assets is not realistically possible absent an expenditure of time and expense that would threaten the realization of any net assets for all the creditors of the Debtor, Owner Defendants, and Affiliated Defendants. Complaint, ¶ 288.

10. In addition, Paragraphs 276-285 of the Complaint re-allege and cross reference the allegations setting forth the facts under which each of the Affiliate Defendants should be substantively consolidated. Complaint, ¶ 276 (Blackstone); ¶ 277 (SS Farms); ¶ 278 (SSC); ¶ 279 (SSC I); ¶ 280 (SSC II); ¶ 281 (SSC III); ¶ 282 (Monterey); ¶ 283 (SMC); ¶ 284 (SK Farms Services). Paragraph 287 of the Complaint re-alleges and cross references the allegations setting forth the facts under which each Owner Defendant, should be substantively consolidated. Complaint, ¶ 287.

11. Thus, before even considering the additional evidence in the record and/or submitted in support of this motion, the deemed admissions to the foregoing facts resulting from

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHDATA 4713258_3

the entry of default establishes that the Debtors and the Defendants operated and held themselves

out to creditors as one enterprise.  In light of the manner in which SK Foods and the Defendants

conducted their operations and held themselves out to the public, the Court finds that the

Defendants' creditors generally did not rely on the separate credit of the Defendants.  More

importantly, the facts deemed admitted further establish that the Debtors and the Defendants are

all alter egos of each other, and it would be impossible to accurately determine the assets and

liabilities of the Debtor and Remaining Defendant entities.

12.    Accordingly, the Court finds that judgment by default substantively consolidating

the Defendants with the Debtors' Estate is warranted.

13.    Additionally, although the Court does not believe it is necessary for it to exercise

its discretion to require the Trustee to put on additional evidence to establish that judgment by

default substantively consolidating the Defendants with the Debtors' estate is warranted, *see*

Fed. R. Civ. Proc. 55(b)(2);  10A Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE

3D § 2688 n.8 (1998, Supp. 2012), the undisputed evidence presented by the Trustee in support

of his alternative motion for summary judgment does, in fact, establish that substantive

consolidation is warranted.

### III.    CONCLUSIONS OF LAW REGARDING THE TRUSTEE'S ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

14.    Even if the Court was prepared to set aside Defendants' default, it would

nevertheless still enter judgment in favor of the Trustee under Rule 56 of the Federal Rules of

Civil Procedure because the Trustee has presented evidence establishing that substantive

consolidation is warranted, and Defendants' Opposition fails to create any triable issue of

material fact.  Further, Defendants failed to establish grounds for a continuance of the hearing on

the Motion pursuant to Rule 56(d).

### A.    Standard for Granting Summary Judgment

15.    Federal Rule of Civil Procedure 56(c) is incorporated by Rule 7056 of the Federal

Rules of Bankruptcy Procedure and provides that summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHDATA 4713258_3

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1  any, show that there is no genuine issue as to any material fact and that the moving party is

2  entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see* Celotex Corp. v. Catrett, 477

3  U.S. 317, 322 (1986); Morenz v. Wilson-Coker, 415 F.3d 230, 234 (2d Cir. 2005). The movant

4  has the initial burden of demonstrating the absence of any genuine issue of material fact. *See*

5  Celotex, 477 U.S. at 323. Once the movant has come forward with uncontroverted facts entitling

6  it to relief, the burden shifts to the non-movant to establish that there is a specific and genuine

7  issue of material fact to warrant a trial. Celotex, 477 U.S. at 324. The respondent must go

8  beyond the pleadings and introduce or point to specific admissible evidence in the record. Id.

9  The evidence must be probative. In re Gertsch, 237 B.R. 160, 165 (9th Cir. BAP 1999) ("Even

10 in cases where elusive concepts such as motive or intent are at issue, summary judgment may be

11 appropriate if the non-moving party rests merely upon conclusory allegations, improbable

12 inferences, and unsupported speculation."). The respondent must also explain precisely why the

13 evidence relied upon would permit the trier to find in their favor on the claim or defense, and a

14 court is not obligated to "sift through the record in search of evidence" to support the

15 respondent's opposition. Ragas v. Tennessee Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir.

16 1998). Conjecture, surmise or "metaphysical doubt" by the non-movant of the movant's

17 assertions will not defeat a summary judgment motion. *See* Matsushita Elec. Indus. Co. v.

18 Zenith Radio Corp., 475 U.S. 574, 586 (1986); *see also*, Bryant v. Maffucci, 923 F.2d 979, 982

19 (2d Cir. 1991). Self-serving conclusory statements are also insufficient to defeat summary

20 judgment. *See* Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir.1993); Moratzka

21 v. Visa U.S.A. (In re Calstar, Inc.), 159 B.R. 247, 251 (Bankr. D. Minn. 1993).

22       16.    In deciding whether material factual issues exist, the Court must resolve all

23 ambiguities and draw all reasonable inferences against the moving party. Matsushita, 475 U.S.

24 at 587. However, the Court is required to do so only in circumstances where a fact specifically

25 averred by the moving party is contradicted by specific evidence submitted in opposition to the

26 motion. Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990). If the record in its

27 entirety could not lead a rational trier of fact to find for the non-movant, then no genuine issue

28 remains for trial. Matsushita, 475 U.S. at 587; California Dept. of Toxic Substances Control v.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   Campbell, 138 F.3d 772, 781 (9th Cir. 1998) (although respondents evidence facially

2   contradicted plaintiff's evidence on the source of environmental contamination, it ultimately did

3   not create a triable issue when viewed in the context of other undisputed facts in the case).

4        17.    Finally, the court must analyze "the evidence presented through the prism of the

5   substantive evidentiary burden." Anderson, 477 U.S. at 250-54. Where the respondent has the

6   burden of proof, the moving party is entitled to summary judgment if it demonstrates that the

7   respondent cannot establish an essential element if its claim. Nissan Fire v. Fritz, 210 F.3d 1099,

8   1102 (9th Cir. 2000).

9        **B.    The Undisputed Facts Establish that Substantive Consolidation is
          Warranted**

10

11       18.    The Court finds that, as a matter of law, the facts set forth above in the Findings

12  of Fact are undisputed, and that there are thus no disputed material facts regarding the question

13  of whether substantive consolidation is warranted. The Court further finds that, based on those

14  undisputed facts, substantive consolidation is warranted, as explained below.

15       19.    As discussed *supra*, substantive consolidation is an equitable remedy designed to

16  ensure the fair treatment of creditors, and under Ninth Circuit law, it is warranted in

17  circumstances where creditors have dealt with the entities as if they are one, *or* the affairs of the

18  Debtors and the Defendants are so entangled that consolidation will result in a benefit to all

19  creditors. Bonham, 229 F.3d at 765 ("In applying the Second Circuit's test, we must determine

20  whether Bonham's creditors either dealt with WPI, APFC and Bonham as a single economic unit

21  and did not rely on the separate credit of each of the consolidated entities; or, whether the

22  operations of WPI and APFC were excessively entangled with Bonham's affairs to the extent that

23  consolidation will benefit all creditors."). With respect to the "entanglement" rationale, the

24  Ninth Circuit has held that substantive consolidation will confer a benefit on creditors in three

25  situations:

26       • where no accurate identification and allocation of assets is possible. Bonham, 229
            F.3d at 766;

27

28

FINDINGS OF FACT AND CONCLUSIONS OF LAW                           PHDATA 4713258_3

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

- where the time and expense necessary even to attempt to accurately identify and allocate the assets is so substantial as to threaten the realization of any net assets for all the creditors. Id.; or

- where the debtor and the target entities are the alter egos of each other such that it would be inequitable to treat the entities as separate. Meruelo Maddux Properties, 667 F.3d at 1075 n.1; Bonham, 229 F.3d at 767 (noting the presence of alter ego factors).

Here, the Court finds that substantive consolidation will confer a benefit on creditors for several reasons.

### 1.    Impossibility of Accurately Identifying and Segregating Assets

20.    First, it is not possible to accurately identify and segregate the assets of the Debtors and the StoneTurn Defendants. The Debtors and StoneTurn Defendants engaged in thousands of intercompany transactions between 2000 and the commencement of the bankruptcy cases on May 5, 2009 but did not keep adequate records from which the nature and purpose of the inter-company transactions could be ascertained. Without the supporting documentation for the recorded transactions, one cannot assess whether the transactions were recorded correctly, e.g., whether a payment of a good or service should be capitalized (recorded on the balance sheet, such as intercompany receivable) or expensed (recorded on the income statement). The lack of appropriate documentation establishing the purposes of the recorded intercompany transfers and the lack of documentation regarding related party transactions that were not recorded makes it impossible to reliably determine whether in reality the Defendants owe money to the Debtors or vice-versa. Since the right to payment of money is an asset of the entity to whom the payment is owed, the lack of documentation means that one cannot reliably determine whether such rights to payment are owned by the Debtors or the Defendants, and therefore, properly identify the respective assets and liabilities of the Debtors and Defendants.

21.    Additionally, it is not possible to accurately identify and segregate the assets of the Debtors and the other Defendants. The Debtors and the Defendants engaged in a months-long effort to reconcile intercompany accounts in late 2007 and early 2008 but ultimately abandoned the effort after concluding it could not be done. The problems with the accounting systems were apparent to the Debtors' outside advisors, and are summed up in an e-mail dated

FINDINGS OF FACT AND CONCLUSIONS OF LAW

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1  February 17, 2009, from John Iacopi (outside financial advisor) to Salyer and Gary Perry

2  (outside counsel to SK Foods).  Mr. Iacopi wrote in part:

> As you know I have been working on the capital accounts and intercompany loans between the entities since last November.  I have been frustrated in my efforts to obtain details of the accounts and accruals and updates as needed.  In some cases I have been dismayed to find a lack of coordination over the reasonableness of some of the charges between the entities.  I realize that a continual turnover and a lack of leadership in the accounting department in the past has contributed to the various errors and ongoing accruals and charges amongst the entities.

> The past allocations of overhead between the entities may have been based on some accounting formulae but the "end result" of some of the charges was most likely not tested for reasonableness.  Mark McCormick tested some amounts in 2008 to find they did not "add up" or "make sense"…

> No one can devote the time or resources or attention to the details and no one wants to recreate allocations of overhead to the past.  Homme Decl., ¶ 23.

11       22.       Thus, the Debtors and the Defendants could not reconcile their intercompany

12  balances at a time when they had the accounting staff and ready access to management, choosing

13  instead to simply "paper over" the problem.  Attempting that task today would be even more

14  difficult and expensive – assuming it could be done at all.  In short, the manner in which

15  intercompany accounts were kept between the Debtors and the Defendants makes it impossible

16  to reliably determine who owes what to whom, and correspondingly, to accurately identify the

17  assets and liabilities of each entity.

18       23.       Lastly, the Trustee is asserting equitable claims to assets paid for with SK Foods'

19  money, *e.g.* the Quite Title Action.  There is a prospect that due to the number of unaccounted

20  for transfers, the Trustee may hold additional equitable claims to other assets traceable to

21  SK Foods money.  See Martin v. Kehl, 145 Cal. App. 3d 228, 237-38 (1983) ("'[A] constructive

22  trust may be imposed in practically any case where there is a wrongful acquisition or detention of

23  property to which another is entitled. . . .  [and] [a] resulting trust arises from a transfer of

24  property under circumstances showing that the transferee was not intended to take the beneficial

25  interest.'").  Given the Trustee's equitable claims, the difficulty and expense of untangling the

26  Debtors and Defendants assets is even greater.

27            ***2.       The Debtors and Defendants Are Alter Egos***

28

- 40 -

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

24.     Because "the separate personality of the corporation is a statutory privilege, it must be used for legitimate business purposes and must not be perverted.  When it is abused it will be disregarded and the corporation looked at as a collection or association of individuals, so that the corporation will be liable for acts of the stockholders or the stockholders liable for acts done in the name of the corporation."  Messier v. Bragg Management Co., 39 Cal. 3d 290, 300 (1985).  To establish that one entity is the alter ego of another, a plaintiff must show "(1) that there [is] such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow."  Id.  Sister entities may be determined to be alter egos if the entities are so organized or controlled as to make one entity "merely an instrumentality, agency, conduit or adjunct of another."  McLoughlin v. L. Bloom Sons, Inc., 206 Cal. App. 2d 848, 851-52 (1962).

25.     Courts have developed a non-exhaustive list of relevant factors in evaluating alter-ego liability, including:

> [1] Commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses;
>
> [2] the treatment by an individual of the assets of the corporation as his own;
>
> [3] domination and control of the two entities by the equitable owners or managers of the entities;
>
> [4] the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; and
>
> [5] the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another.

Zoran Corp. v. Chen, 185 Cal App. 4th 799, 811–12 (2010).  Accordingly, recognition of the separateness of a corporation or partnership depends fundamentally upon whether those in control of the entity respect (i.e., not abuse) that separation.  Palmas Assocs. v. Las Palmas Center Assocs., 235 Cal. App. 3d 1220 (1991) ("[I]t would be unjust to permit those who control companies to treat them as a single or unitary enterprise and

1  then assert their corporate separateness in order to commit frauds and other misdeeds

2  with impunity."). For example, when owners of an entity use their control to siphon off

3  corporate assets to benefit owners or related entities and nothing is given in return, that

4  conduct is deemed to be inequitable because it harms the interests of the corporation and

5  its creditors. *See* Crestmar Owners Ass'n v. Stapakis, 157 Cal.App.4th 1223, 1232

6  (2007) (transfer of assets for no consideration deemed inequitable and justified alter ego

7  finding).

8    26.    Based upon the following, the Court concludes that the Defendants should be

9  deemed alter egos of the Debtors, and therefore, that the Debtors creditors hold claims against

10  the Defendants that should be considered in evaluating the propriety of substantive

11  consolidation:

12    *(a)    Common Ownership and Control*

13    27.    Salyer, in his capacity as trustee for the SSR Trust and SKPM owned SK Foods.

14  SKPM acted as the Debtors' general partner. The Debtors' owners, as well as all of the

15  Defendants, shared common management under the ultimate control of Salyer. March 9, 2010

16  Seymour Decl., ¶¶ 5-6 & 42-45.

17    *(b)    Undercapitalization*

18    28.    The Defendants were undercapitalized. March 9, 2010 Seymour Decl., ¶¶ 31-32.

19    *(c)    Commingling of Assets and Business Functions*

20    29.    The Defendants did business almost exclusively with the Debtors and other

21  affiliated entities, and they shared assets (such as facilities, servers, etc.). Id., ¶¶ 23-27. Most

22  importantly, the Debtors served as the "bank" for the Defendants and over $205 million was

23  transferred back and forth between the Debtors and the StoneTurn Defendants (a subset of the

24  Defendants) in the decade prior to bankruptcy. August 19, 2009 Seymour Decl., ¶ 7, Exhibit 2;

25  March 9, 2010 Seymour Decl., ¶¶ 4-6, Exhibit 1; and May 8, 2009 Declaration of Lisa Crist,

26  ¶ 18.

27    *(d)    Disregard of Corporate Separateness*

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHDATA 4713258_3

30.     Salyer disregarded the separateness of the Defendants from the Debtors and treated the assets of SK Foods as if they were his own.  He arranged for the Debtors to pay the sums due to his wife under the terms of his divorce settlement by channeling the funds through Salyer Management Company.  March 9, 2010 Seymour Decl., ¶ 12.  Assets were also transferred without the observance of corporate formalities, including the transfer of the Debtors' rights in the wastewater properties and the aggregation and transfer off-shore of all cash held by the Defendants shortly after the Debtors' bankruptcy.  March 9, 2010 Seymour Decl., ¶ 61-63, Exhibit 2, 3 & 5.  One Defendant often paid the debts of another Defendant.  Homme Decl., ¶ 34, Ex. 2.

*(e)     Diversion of Assets*

31.     In addition to the payments to his ex-wife, transfer of rights to the wastewater properties, and cash transfers to the Defendants referenced immediately above, in the run up to and the months following the SK Foods bankruptcy in 2009, Salyer engaged in further inequitable conduct by directing the Defendants to transfer virtually all of their remaining cash to overseas accounts held by Fast Falcon.  Affidavit of Special Agent Paul S. Artley, RJN, Exhibit 1-C.  In addition, Salyer directed SS Farms to transfer its stock in SS Farms Australia Pty. Ltd. to Fast Falcon, and he purported to transfer the Debtors interests in SK Foods Australia Pty. Ltd. to Fast Falcon as well.  August 2, 2012 Nuti Decl., ¶ 19, Ex. 5 (documents purporting to ultimately transfer the SKFA Stock to Fast Falcon).  Fast Falcon was established for the express purpose of shielding assets under Salyer's control from the claims of creditors.  Heiser Decl.), ¶ 6, Exhibit E.  These actions demonstrate that Mr. Salyer operated and ran each Defendant in a fashion that suited his purpose and served his personal agenda, and that there is no true separation among them.

32.     It is well recognized that the foregoing conduct constitutes abuse of the corporate form.  Based upon all the forgoing, the Court finds that the Defendants are mere alter egos of the Debtors.

**3.     *Substantive Consolidation Will Promote Fairness to All Creditors***

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

33.    Salyer's pervasive misuse of SK Foods to serve his own purposes gives each creditor of SK Foods a claim against the Debtors' owners, including SKPM.  California law also makes the Defendants who are "sister" affiliates to SK Foods liable to the Debtors' creditors under an alter ego theory as well.  McLoughlin, 206 Cal. App. 2d at 851-52 (affiliates are alter egos when the entity is merely an instrumentality, agency, conduit or adjunct of another).  In addition, as a general partner, SKPM is also liable for all of the Debtors' debts.  Cal. Corp. Code § 16306(a).  Accordingly, substantive consolidation will promote fairness because the Debtors' creditors already are creditors of the Defendants as defined in 11 U.S.C. § 101(10) (defining creditor as an entity holding a claim).  Substantive consolidation will ensure that the Defendants' assets are shared ratably among all creditors, and that preference is not given to any creditor or the equity owners of the Defendants.

34.    Moreover, substantive consolidation will benefit creditors by avoiding the cost (assuming it is even possible) of trying to determine the proper characterization of the multitude of intercompany transfers in order to ascertain who owes what to whom.  All creditors will benefit because it will avoid the cost and expense of resolving the equitable ownership claims SK Foods has against the Defendants as a result of their fraudulent transfers of assets and the usurpation of corporate opportunities by Salyer.  There is also an undeniable benefit to creditors of both the Debtors and the Defendants to place the Defendants assets under the control of a court-supervised fiduciary rather than Salyer who has shown himself determined to move assets into Fast Falcon in order to avoid paying creditors.  Finally, in assessing the relative benefits of substantive consolidation, the Court notes that only two creditors filed objections to the Trustee's Motion and that those objections are now resolved.

35.    Lastly, Creditors will benefit because consolidation will resolve disputes over the Trustee's equitable claims to the Defendants' assets.

36.    Based on the foregoing, the Court finds that substantive consolidation will promote fairness amongst the creditors of the Debtors and the Defendants.

### 4.    Defendants' Creditors Did Not Rely on Their Separate Credit

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                    PHDATA 4713258_3

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

37.    Under *Bonham*, there is a presumption that creditors of interrelated companies did not rely on the separate credit of the Defendants, and the burden of proof is on the parties opposing substantive consolidation to show otherwise. Bonham, 229 F.3d at 767. Here, based upon the close relationship of the Debtors and the Defendants, the fact that the Debtors and Defendants held themselves out as "SK Foods Group" and used the same URL for their e-mail addresses, and the fact that only two out of 1216 potential creditors of the Defendants filed objections to the relief requested by the Trustee, the Court finds that creditors generally did not rely on the separateness of the entities. In light of *Bonham*'s presumption, the Court finds that there was no reliance and substantive consolidation is warranted based upon the "creditor expectation" rationale as well.

## C.    Additional Conclusion of Law Related to the Granting of Substantive Consolidation

### 1.    *Substantive Consolidation is Granted* Nunc Pro Tunc

38.    Having found that substantive consolidation is appropriate here, the Court further finds it appropriate to order substantive consolidation *nunc pro tunc* to the Petition Date of May 5, 2009.

39.    In appropriate circumstances, "bankruptcy courts have sanctioned substantive consolidation of two or more entities *nunc pro tunc* in order to allow a trustee to attack fraudulent transfers or avoidable preferences made by the debtor or consolidated entities as of the date of filing of the initial bankruptcy petition." In re Bonham, 229 F.3d 750, 765 (9th Cir. 2000) (citations omitted). Further, substantive consolidation *nunc pro tunc* may be proper even if the target entity has no assets to pool and the primary motivation is to allow the trustee to pursue avoidance actions. Id. at 768. Where *nunc pro tunc* relief is sought, the proponent must make a showing that such relief is necessary to achieve some benefit or avoid some harm. Id. at 770. The Trustee has satisfied his burden in this regard.

40.    Here, the evidence demonstrates that several of the Defendants have significant real property assets. Others, however, are either holdings companies or mere shells through which Salyer transferred large sums of money both before and after May 5, 2009. Thus, part of

- 45 -

the value in ordering substantive consolidation *nunc pro tunc*, like in Bonham, is to preserve

avoidance claims (to the extent the Trustee can succeed in invoking the doctrine of equitable

tolling, an issue over which the Court is making no determination at this time). Moreover, if the

Court were to decline to order substantive consolidation retroactively, the primary beneficiaries

of that decision would appear to be Salyer and other insiders.

41.     The length of time in this case between the Petition Date and the order for

substantive consolidation also does not bar *nunc pro tunc* relief. In *Bonham*, the bankruptcy

court ordered substantive consolidation on April 10, 1998 *nunc pro tunc* to the petition date of

December 19, 1995. *See* In re Bonham, 226 B.R. at 58-60. After the district court overturned

the bankruptcy court's ruling, on October 2, 2000 the Ninth Circuit issued its opinion, reversing

and remanding the matter, in effect ordering *nunc pro tunc* substantive consolidation almost five

(5) years after the petition.

42.     After carefully considering the implications of ordering substantive consolidation

retroactively, the Court finds that substantive consolidation *nunc pro tunc* to the petition date is

appropriate under the circumstances of this case.

     *2.     The Trustee Will Maintain His § 549 Powers*

43.     Additionally, the Court finds that it is appropriate to preserve the Trustee's

powers, pursuant to 11 U.S.C. § 549, to avoid post petition transfers.

     *3.     Setting New Claims Bar Dates*

44.     The granting of substantive consolidation will necessitate the setting of new

claims bar dates for both administrative and general unsecured claims for claims against the

Estate in connection with the judgment for substantive consolidation. Accordingly, the Trustee

shall, within 30 days of the entry of these findings and conclusions, file a motion for an order

setting such dates, with appropriate notice.

     *4.     Rule 54(b)*

45.     The Court expressly finds that is appropriate under the circumstances of this case

to enter final judgment as to less than all of the claims for relief alleged in the Trustee's

Complaint and against less than all the parties sued in the Complaint, pursuant to Federal Rule of

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1    Civil Procedure 54(b).  The underlying bankruptcy case has been pending for over four (4) years.

2    Resolution of the issue of substantive consolidation is necessary in order to allow the Trustee to

3    move forward with confirmation of a Chapter 11 plan of liquidation in the Debtors' bankruptcy

4    case.  Moreover, it appears that given that the assets that will be consolidated into the Debtors'

5    estate consist of real property devoted to agricultural uses, and so there are business reasons to

6    begin marketing those parcels in advance of the next growing season.  Finally, it appears that

7    entry of final judgment on the Fourth Claim for Relief as to the Defendants will likely moot the

8    need for further litigation in this matter, and in Adv. Proc. No. 09-2962 in which the Trustee

9    seeks to quiet title to some of the same assets that are the subject of the instant action.

10         46.    For all of the foregoing reasons, the Court concludes that there is no just reason to

11   delay entry of final judgment on the Fourth Claim for Relief.

## CONCLUSION

For the foregoing reasons, the Court find that the Trustee is entitled to the entry of

judgment on his forth claim for relief in his complaint against Defendants SKPM, SKF, SKF

Canning, Blackstone, Monterey, SMC, SK Farms Services, SS Farms, SSC, SSC I, SSC II, and

SSC III, and judgment therefore will be entered consolidating the assets of those Defendants

with the Debtors' Estate *nunc pro tunc* to the Petition Date.

Dated:    OCT - 2 2013        By: *Robert Bardwil*

ROBERT S. BARDWIL
UNITED STATES BANKRUPTCY JUDGE

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

- 47 -